Dyan Finguerra-DuCharme
Robert J. deBrauwere
Felicity Kohn
Nicholas Saady
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Tel: (212) 421-4100

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| METAx LLC,<br><br>                              Plaintiff,<br><br>      - against -<br><br>META PLATFORMS, INC.,<br><br>                              Defendant. | Civil Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff METAx LLC (collectively, with all of its predecessors-in-interest, "Meta" or "Plaintiff"), by its attorneys Pryor Cashman LLP, alleges as follows against Defendant Meta Platforms, Inc., f/k/a Facebook, Inc. ("Facebook" or "Defendant"):[1]

### NATURE OF ACTION

1.      Facebook has brazenly violated fundamental intellectual property rights enshrined in U.S. law to obliterate a small business, Meta.

2.      On October 28, 2021, Mark Zuckerberg announced that Facebook was changing its name to "Meta" — to become the key global player in the industry involving experiential and immersive technologies and in the creator communities associated with that industry. In doing so, Facebook seized the META name and mark, under which Justin "JB" Bolognino — a pioneer in

---

[1] We define Defendant as "Facebook" because, otherwise, it would be impossible to easily read and distinguish between the parties in this Complaint.

the field of experiential and immersive technologies, and one of the initial guardians of the creator community — had the foresight to conduct business since 2010, when he founded Meta.

3.     Astoundingly, Facebook's due diligence team ignored Meta's federal registrations for the META mark that expressly identify services "using digital, virtual and augmented reality."

4.     That Facebook disregarded Meta's prior rights in the META mark is staggering considering that in August 2017, a Facebook executive attended one of Meta's immersive experiences and subsequently wrote to Bolognino, lauding Meta's products and services as "AMAZING" and "spectacular," and requesting that Meta and Facebook partner on future work — which they eventually did.

5.     Despite its actual knowledge of Meta, and apparently believing that it could trample the rights of this small business with impunity, Facebook has deployed its almost limitless resources to saturate the marketplace with its infringing META mark.  Meta stands no chance against the corporate goliath that is Facebook.

6.     Shortly after Facebook's rebrand, Meta contacted Facebook and identified its infringing conduct.  Facebook responded by baselessly asserting that Facebook and Meta offered "drastically different goods and services" — admitting that Meta offered "multi-sensory live experiences" whereas Facebook was just a "social technology company."

7.     For over eight months, Meta acted in good faith, including by providing Facebook with thousands of pages of information demonstrating Meta's broad trademark rights and the identical nature of Meta's and Facebook's goods and services.  But, consistent with Facebook's ethos of "might makes right," Facebook doubled down on its efforts to overwhelm Meta in the marketplace.

8.     Blatantly contradicting its assertions months earlier, Facebook is now doing exactly what Meta has done for more than a decade — including by conducting the same immersive

experiences, at the same events and venues, and working with the same creators and same companies.

9.     Meta has been crushed by Facebook's flagrant, unlawful conduct.  Meta can no longer provide goods and services under the META mark because consumers are likely to mistakenly believe that Meta's goods and services emanate from Facebook and that Meta is associated with the toxicity that is inextricably linked with Facebook.

10.     Federal and state law clearly prohibit Facebook's conduct.  This is textbook, unlawful reverse confusion, which has caused, and is continuing to cause, irreparable harm to Meta.

11.     That irreparable harm, along with Facebook's unreasonableness and arrogance, has forced Meta to commence this action to vindicate its rights and save the revolutionary business Bolognino built from the ground up over a decade ago.

## PARTIES

12.     Meta is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business in the State of New York.

13.     Upon information and belief, Defendant is a corporation organized and existing under the laws of the State of Delaware with a principal place of business in the State of California.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over the claims in this Complaint that relate to trademark infringement and unfair competition pursuant to 15 U.S.C. §§ 1114, 1121, 1125(a), 28 U.S.C. §§ 1331, 1338, 1367, and principles of supplemental jurisdiction.

15.     This Court has supplemental jurisdiction over the claim in this Complaint that arises under the common law of the State of New York pursuant to 28 U.S.C. § 1367(a), because the

state law claim is so related to the federal claims that it forms part of the same case or controversy and derives from a common nucleus of operative facts.

16.     This Court has personal jurisdiction over Defendant because, upon information and belief, Defendant: (i) transacts business within the State of New York; (ii) contracts to supply goods and services within the State of New York; (iii) has committed infringing acts within the State of New York; and (iv) has committed infringing acts outside of the State of New York causing injury to Plaintiff in the State of New York — in circumstances where Defendant (a) regularly does and solicits business in New York, (b) derives substantial revenue from goods used and consumed and services rendered in New York, and (c) expects and reasonably expects its infringing conduct to have consequences in New York and derives substantial revenue from interstate and international commerce.  Such activities fall within the long-arm statute for personal jurisdiction in the State of New York, C.P.L.R. §§ 301 and 302(a).

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is deemed to reside in this District and because Defendant's acts are causing confusion of the public and injury to Plaintiff, or a likelihood of confusion and injury, within this District and elsewhere.

## **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

### I.     **Meta and the META Mark**

18.     Meta was founded in 2010 by Justin "JB" Bolognino.

19.     Bolognino is a true pioneer of the industry involving immersive and experiential technologies, including augmented reality ("AR"), virtual reality ("VR"), and extended reality ("XR") (collectively, the "Industry").  He is renowned as a designer of original thought leadership in the Industry and the Chief Executive Officer of Meta.  He is also widely respected in the Industry as one of the initial cultivators and protectors of the creator community associated with the Industry — a creator-driven focus which permeates Meta to this day.

20.     Bolognino had the foresight to adopt the name "Meta," long before immersive and experiential technologies, and the still-developing "metaverse"[2] were known by the general public.

21.     Bolognino, through his innovative and diligent work, built Meta from scratch into a market leader in the Industry, which is known, celebrated, and respected for its goods and services.

22.     Through the hard work, dedication, and innovation of Bolognino and his team, Meta developed into a pillar of the creator and consumer communities associated with the Industry. Meta has fought for, and protected, the intellectual property rights, attribution, and financial interests of creators associated with the Industry — an ethos that remains in Meta's DNA to this day.

23.     Since 2010, Meta has continuously used the term "META" as part of a composite mark and has been commonly referred to as "Meta" in trade and commerce.

24.     Meta has also continuously used META as a standalone mark and adopted a distinctive META logo (comprising a stylized M symbol followed by the term "META") in trade and commerce.

25.     Meta's website is found at the URL https://meta.is/.

26.     Meta offers a broad range of goods and services to its consumer base, which includes companies and businesses (of all sizes, resources, and sophistication) as well as individuals (including creators in the Industry, and the general consuming public who attend events such as Coachella Valley Music and Arts Festival ("Coachella"), South by Southwest ("SXSW"),

---

[2] A robust "metaverse" does not yet exist.  What are currently promoted as "metaverse"-related services and products actually involve the use of immersive and experiential technologies — such as AR, VR, and XR.  The developing "metaverse" is being, and will continue to be, built using immersive and experiential technologies by creators in the Industry (as Facebook itself has publicly admitted: *see* https://futurism.com/confusing-facebook-not-building-metaverse (citing **Exhibit H** annexed hereto (https://nickclegg.medium.com/making-the-metaverse-what-it-is-how-it-will-be-built-and-why-it-matters-3710f7570b04))).

and Cannes Lions: The International Festival of Creativity ("Cannes Lions")). *See* https://meta.is/about/.

27.     For over a decade, Meta has invested significant resources in the promotion of the META mark — including, without limitation, through offering its goods and services, extensive consumer email and other marketing campaigns, on social media, the internet-at-large, and in mainstream media.

28.     Meta's goods and services include, without limitation, the following:

a.     Arranging and conducting special events and immersive solutions for commercial, promotional, advertising, and creator-community building purposes; live and experiential event planning and management for marketing, branding, promoting, or advertising the goods and services of others; immersive and social media strategy and marketing consultancy focusing on helping creator-community-focused and other clients create and extend their product and brand strategies by building virally engaging marketing solutions; special event planning and experiential solutions for business purposes; organizing, arranging, and conducting live interactive an immersive marketing promotional events for business advertising purposes;

b.     Providing online and virtual community forums for users to share and stream information, audio, video, real-time news, entertainment content, or information, to form virtual communities, and to engage in social networking; telecommunications services, including, electronic transmission of virtual reality content and data; streaming and live streaming of audio, visual, and audiovisual gaming content via a global computer network; entertainment services, namely, providing access to interactive electronic and online databases of user-defined content, third-party content, photos, video, audio, visual, and audio-visual material in the field of general interest; photosharing, and video sharing services; electronic exchange of voice, data, audio, video, text, and graphics via the internet and telecommunications networks; peer-to-peer photo and data sharing services, namely, electronic transmission of digital photo files, graphics, and audio content among internet users; photo sharing and video sharing services, namely, electronic transmission of digital photo files, videos, and audio visual content among internet users; providing a forum, chat rooms, and electronic bulletin boards for users for transmission of messages and sharing information regarding immersive AR, VR, and XR digital technology and social networking via an online website, applications, and other computer and electronic communication networks; providing online forums for communication, namely, transmission on topics of general interest; telecommunications services, namely, electronic transmission of data, messages, graphics, photographs, images, audio, video, and audio-visual

6

content, and virtual, mixed, and augmented reality content and data;

c.   Experience and event production, hosting and planning for entertainment purposes; entertainment services in the nature of development, creation, production, distribution, and post-production of multimedia entertainment content, including immersive, experiential, and interactive entertainment, virtual reality, augmented reality, and mixed reality; provision of information in the fields of immersive AR, VR, and XR digital technology via the internet, webinars, live streams, and discussion forums; and

d.   Development and planning of software as a Service (SaaS) services, namely, hosting software for use by others in connection with creating immersive, interactive, virtual environments; development and planning of software as a Service (SaaS) services, namely, hosting software for use by others in connection with uploading, rearranging, and delivering media content, compliance with multiple listing services, tagging, classifying, indexing, and storing images, high dynamic range image processing, and video creation; design and development of multimedia products; and

e.   Design and development of immersive and experiential technologies and products; advisory and consulting services regarding the use of immersive and experiential technologies and products; providing immersive and experiential design services for the purpose of promoting the goods and services of others; immersive and experiential design project management services.

29.   Meta also secured two federally registered trademarks covering many of the goods and services that it renders under the META mark: (1) U.S. Reg. No. 5,194,332 in International Class 35 for various services including, but not limited to, "social media strategy and marketing consultancy focusing on helping clients create and extend their product and brand strategies by building virally engaging marketing solutions"; and (2) U.S. Reg. No. 6,055,841 in International Class 41 for various services including, but not limited to, "entertainment, namely, production of community sporting and cultural events using digital, virtual and augmented reality filmmaking and interactive displays of lights, sound and motion."  True and correct copies of Meta's valid and subsisting U.S. trademark registrations, along with copies of USPTO TSDR printouts showing the current status of the registrations, are annexed hereto as **Exhibit A**.

30.   Collectively, the goods and services stated in Paragraphs 28 and 29 are referred to

herein as the "Meta Goods and Services."

31.     Collectively, Meta's use of the META mark and Meta trade name in connection with the Meta Goods and Services are referred to herein as the "META Mark."

32.     Through Meta's efforts since 2010, and its significant marketplace success, the META Mark has become known amongst consumers as a single source identifier of Meta's high-quality, ethical, and reputable goods and services.

33.     The services and products rendered under the META Mark have been at the forefront of the Industry, and have laid the foundations for the developing, although not yet fully existent, "metaverse."

34.     The goods and services rendered under the META Mark are widely recognized and trusted by some of the Industry's most influential individuals, businesses, and institutions, as well as all other consumers and creators in the Industry.

35.     Until Facebook's rebranding in late-2021, the META Mark identified Meta as the only source of the Meta Goods and Services in the Industry.

36.     Since its rebranding, Facebook's goods and services offered under its infringing META mark are related, or identical, to the goods and services offered by Meta.

## II.    Meta's Business

### a)   Meta's Revolutionary Experiential and Immersive Experiences

37.     Since 2010, Meta has developed, curated, and hosted experiential and immersive experiences for corporate and individual consumers, including experiences at some of the world's largest events and festivals. *See, e.g.,* https://meta.is/experiences/.

38.     These include solely Meta-branded experiences, as well as experiences that are co-branded or co-hosted by Meta and other companies or individuals.

39.     The experiences Meta has created and conducted involve the sophisticated curation

of the most influential and talented creators in the Industry, as well as the design, development, and use of a complex and varied array of immersive and experiential technologies and techniques.

40.     A selection of VR-related experiences that Meta has created and conducted are listed on Meta's website and are shown in Figure 1.

**Figure 1**



41.     A selection of AR-related experiences that Meta has created and conducted are listed on Meta's website and are shown in Figure 2.

**Figure 2**



42.     Experiences that Meta has created, curated, and conducted include:

    a.     In 2010, Meta was engaged by Microsoft and Red Bull to create, curate, and conduct live immersive experiences, alongside talented creator, CTRL;

    b.     In 2012, Meta was engaged by Lincoln Motor Company to create, curate, and conduct an immersive experience featuring projection mapping as a storytelling device, alongside esteemed creators including VolvoxLabs,

CTRL, and Incredible Machines — which was revolutionary at the time as a creator-centric experience;

c.  In 2012 and 2013, with partners including Twitter, Samsung, and Soundcloud, Meta created, curated, and conducted #FEED, which changed the immersive world by being the first-ever experience to feature as many as 16 different immersive technology creator commissions — laying the first bricks to what is now being developed as the "metaverse." These immersive experiences were transformative for SXSW;

d.  In 2016, Meta broke major technological and cultural barriers by creating, curating, and conducting various revolutionary AR experiences — including some of the first-ever AR experiences at SXSW, in partnership with Spotify, SyFy, Refinery 29, and Neiman Marcus;

e.  For three consecutive years from 2016 to 2018, Meta undertook a revolutionary new approach for festival immersive experiences, by creating, curating, and conducting "The Lab" experience at Panorama. The Lab involved the complex curation of AR, VR, XR, and immersive dome technologies — alongside some of the biggest creators of the time, including St. Vincent, Android Jones, The Windmill Factory, Smooth Technology, Kate Raudenbush, Superbright, Dev Harlan, Sougwen, Magenta Field, Softlab, VolvoxLabs, Max Cooper, Invisible Light Network, Dirt Empire, Gabriel Pulecio, Zach Lieberman, Future Wife, Dave & Gabe, and Red Paper Heart. The *Wall Street Journal* featured The Lab as a "creative-technology showcase" and "Digital Art for Jumping Into," *Forbes* described The Lab as "the Right Way to Integrate Art &

Tech," and *Rolling Stone* described it as a "Groundbreaking Virtual-Reality Experience";

f.   In 2017, alongside Android Jones and Microdose VR, Meta created, curated, and conducted the first-ever multi-person, social VR experience at Coachella, sponsored by HP and Intel;

g.   In 2018, Meta brought an immersive VR dome experience to the center of Coachella — creating, curating, and conducting the "Flatland: A Romance of Many Dimensions" experience in a 150-foot dome.  The META Mark was prominently displayed within that dome, and Meta's services, including its UNREALITY platform, were advertised to over one hundred thousand people;

h.   In 2018, Meta created, curated, and conducted Hyperspective, an immersive "Social Virtualized Experience" festival held in Los Angeles.  It involved members of the public gathering within a 39-foot VR dome, to view a multitude of immersive story screenings of various durations.  The festival was set to recur in New York City in May 2020, only to be stopped by the COVID-19 pandemic;

i.   In 2021, as the pandemic subsided, Meta curated and produced the "Sound FX" immersive experiences in New York City, Chicago, and Los Angeles — featuring revered creators Softlab, Emilie Baltz, and Vitamotis;

j.   In November 2021, Meta created and conducted "The Stranger Party" experience after NFT.NYC 2021.  The Stranger Party involved a surrealistic meal by multisensory storyteller Emilie Baltz and was co-hosted by NFT curatorial legend Lady PheØnix.   The experience was attended by

12

approximately 40 luminaries of the Industry, and 400 other individuals associated with the Industry — synchronizing the creator communities, including the NFT, metaverse, and Web3 communities; and

k.   Right now, and since 2019, Meta has been an integral co-owner and conductor of Arcadia Earth in New York City, alongside creative partner Valentino Vettori, which features large-scale and interactive projection mapping installations, while also deploying both augmented and virtual reality navigation — with the ultimate purpose of promoting sustainability and climate action.

43.   The META Mark has been consistently displayed to Meta's consumers both digitally and in real life — including in marketing and pitching materials (including social media advertisements and direct email communications to consumers); social and mainstream media; the internet-at-large (including on Meta's website and the websites of experience partners and promoters); and at Meta's experiences (including as part of the experiences themselves).

44.   Meta has provided its products and rendered its services to globally recognized companies and institutions such as HP, Google, Twitter, Nike, FX, Goldenvoice, Coca-Cola, Spotify, SyFy, SoulCycle, The Smithsonian Institution, H&M, Verizon, Microsoft, Pandora, Target, PepsiCo, AT&T, Lincoln Motor Company, SuperFly, Naked Juice, Oakley, and the American Society of Composers, Authors and Publishers.  *See* https://meta.is/about/ under the headings "Clients" and "Collaborators."

45.   Bolognino and Meta have been the subject of substantial unsolicited media praise in renowned publications, social media, blogs, and mainstream media — including in *The New York Times, Rolling Stone Magazine, The Wall Street Journal, Forbes, Vogue, Newsweek, Mashable, Vice, The Verge, Complex Magazine, Celebrity Access, Agency Post, Examiner, The*

*Creator's Project, Wunderman Thompson, The Hindu,* and *One Small Seed.* Attached hereto as **Exhibit B** are excerpts from just some of those sources; *see also* https://meta.is/about/ under the heading "Press."

     **b) Meta's Creator and Consumer Communities, including Meta's Social Network Platform, UNREALITY powered by Meta**

46.    Since 2010, Meta has been an influential member of the creator communities associated with the Industry.

47.    As a groundbreaker in the Industry and a central figure in the creator economy and creator and consumer communities associated with the Industry, Meta's critical mission since its inception has been to ensure that the Industry's innovators and creators are fairly and properly supported, regarded, and compensated, not treated as fungible, work-made-for-hire laborers.

48.    Meta was borne of this pursuit, working with the preeminent talent in the Industry — including respected, global stars such as Beeple, Takashi Murakami, St. Vincent, Skrillex, Tiesto, Porter Robinson, and Android Jones.

49.    Meta also has a significant historical and present involvement in the creation and development of real-world and virtual social communities associated with the Industry.

50.    In 2017, Meta commenced development of its social network platform and creator marketplace, UNREALITY, which is tailored to creators and consumers associated with the Industry.

51.    Meta displays the META Mark in connection with its UNREALITY platform, and UNREALITY is known by consumers as being created and offered by Meta.

52.    In April 2018, Meta announced UNREALITY to attendees of one of the biggest events in the world, Coachella. Over one hundred thousand people were exposed to advertisements about UNREALITY online, in social media, in promotional material, and in real

life at the 2018 Flatland experience.

53.     In early fall 2019, Meta granted access to the UNREALITY platform to creators in the Industry.

54.     Since that time, two further versions of UNREALITY have been released (the current version is version three).

55.     Meta also promoted UNREALITY at Meta's "The Stranger Party" experience held after NFT.NYC 2021.  The Stranger Party was attended by hundreds of individuals associated with the Industry.

56.     UNREALITY is a hub for, and used by, prominent individuals and businesses in the Industry.

57.     UNREALITY is based on Meta's business intelligence, consumer goodwill, and long-standing commercial success in the Industry.

### c)  Meta's Goods and Related Services

58.     In addition to the experiences it offers directly to consumers, Meta offers other goods and related services to consumers, using the META Mark.

59.     Meta's "XCollection" marketplace of goods are displayed on the Meta website.

60.     One product within the XCollection is the META DOME POD, which is available to consumers (*see* **Exhibit C** annexed hereto (the META DOME POD production guide).  The META DOME POD is a social, virtual reality immersive experience, including high resolution video, surround sound, and advanced dome projection technology.  It creates a truly immersive experience for up to eight people simultaneously — being one of the first-ever social VR products available to consumers.

61.     For over a decade, the META Mark has been consistently displayed to consumers when Meta provides its goods and services to consumers, and when Meta markets and promotes

its goods and services.

62.     By reason of the foregoing exclusive and continuous use of the META Mark for over a decade, Meta has developed substantial goodwill in the META Mark.

63.     The META Mark is Plaintiff's most valuable commercial asset.

III.     **Facebook Rebrands as "Meta" and Infringes the META Mark**

    **a.  Facebook Rebrands as "Meta"**

64.     On September 28, 2021, Bolognino sent an email to over ten thousand members of the Meta mailing list, which relevantly stated that "we can emphatically say the world has become discernibly more … META.  With the sudden explosion of the Metaverse, we finally see digital creators getting the praise and earnings they deserve thanks to NFTs. … We've got some pretty exciting new projects to share, and lots more cooking on Unreality, our social marketplace for the immersive industry."  *See* **Exhibit D** annexed hereto.

65.     Exactly one month later, on October 28, 2021, Facebook, Inc., facing numerous scandals, pressure from investors, regulatory investigations, and private litigation, rebranded and began publicly portraying itself as "Meta" and began using its infringing META mark.

66.     Facebook's META mark is visually and aurally identical to the META Mark.

67.     Even the companies' logos are conceptually identical, using the word META proceeded by a symmetrical object that in both instances suggests the letter M:



         **Meta's Logo**                      **Facebook's Logo**

68.     Facebook's Newsroom post from October 28, 2021 stated that the company's new "focus will be to bring the metaverse to life and help people connect, find communities and grow

businesses." *See* **Exhibit E** annexed hereto (https://about.fb.com/news/2021/10/facebook-company-is-now-meta/).

69.    Facebook's new vision, clearly expressed by Zuckerberg and other Facebook personnel on October 28, 2021 (*see, e.g.,* https://www.youtube.com/watch?v=nGHbOckpifw) to focus on "experiences" is identical to one of Plaintiff's key missions: to "create[] multi-sensory live **experiences** that ignite the human spirit with technology, design, music, and storytelling" (*see* https://meta.is/about/ (emphasis added)).

70.    Facebook also revamped its annual conference called "Connect" to highlight Facebook's new, core business focus on AR, VR, XR, and other immersive and experiential technologies, goods, and services — the identical technologies, goods, and services that Meta is using, and has used, for over a decade.

71.    At 2021 Connect, Facebook also outlined another of its new, core business focuses, to "bring[] together **augmented and virtual reality developers, content creators, marketers and others** to celebrate the industry's momentum and growth" (*see id.* (emphasis added)) — who are the identical consumers of Meta's services and products, and the very communities that Meta has helped create and develop for over a decade.

72.    All of the above overlap in the goods and services offered by Meta and offered, or intended to be offered, by Facebook was reinforced by Facebook's Form 10-K for the fiscal year ended December 31, 2021, which stated that Facebook "is moving beyond 2D screens toward **immersive experiences like augmented and virtual reality** to help build the metaverse, which we believe is the next evolution in social technology. … All of our products, including our apps, share the vision of helping to bring the metaverse to life." *See* **Exhibit F** annexed hereto (Meta Platforms, Inc., Form 10-K, for the fiscal year ended December 31, 2021 (emphasis added)).

73.     The overlap between goods and services was affirmed during Facebook's 2021 Q3 Results Conference Call, when Zuckerberg stated on behalf of Facebook that "we think [the metaverse is] going to **unlock a massively larger creative economy** of both digital and physical goods than what exists today … and enabling a whole different economy around that, that I think is going to be another important pillar of our business, over the next decade. … There's the whole **virtual reality product line**.  There's the **augmented reality product line**. … And then there's **all the social platform work that we're doing** with our Horizon effort."  *See* **Exhibit G** annexed hereto (Facebook, Inc. Third Quarter 2021 Results Conference Call, October 25, 2021, https://s21.q4cdn.com/399680738/files/doc_financials/2021/q3/FB-Q3-2021-Earnings-Call-Transcript.pdf (emphases added)).

74.     Further reinforcing the overlap between goods and services, on May 18, 2022, Facebook, through Nick Clegg (its President of Global Affairs), publicly described the entire "metaverse" on which Facebook is now focused as being "**a more immersive … experience**," and defined the "first floor" of the "metaverse" as being where "the **vast array of experiences** will be available" to consumers.  *See* **Exhibit H** annexed hereto (https://nickclegg.medium.com/making-the-metaverse-what-it-is-how-it-will-be-built-and-why-it-matters-3710f7570b04 (emphases added)).

75.     Facebook now uses the "Meta" name as an umbrella corporate trade name covering all of its goods and services, in an identical manner to the way Meta uses, and has used, Meta as an umbrella trade name for its goods and services.  For example, the UNREALITY platform is offered under the Meta umbrella trade name (as shown in the screenshot from Meta's website which forms Figure 3), and now Facebook does the same with Facebook Blue and Instagram (as shown in the screenshot from Facebook's website which forms Figure 4).

**Figure 3**



**Figure 4**



**b.  Facebook Purchases Other "META-Formative Marks,"
Effectively Acknowledging Its Infringement**

76.     Prior to October 2021, and beyond, Facebook acquired third-party trademark applications and registrations for META-formative marks at a furious pace — effectively acknowledging the risk of infringing the rights of prior-existing businesses and attempting to gather arrows in its quiver to use to crush such prior-existing businesses.

77.     Facebook ruthlessly moved forward with its rebranding and devoured other smaller

19

players' trademark rights and businesses.

78.     Presumably due to Facebook's extremely broad range of goods and services, all of which it has incorporated under the Meta umbrella trade name, Facebook reached as far as marks relating to optical device manufacturing companies, digital marketing and advertising companies, and even financial services companies.  *See, e.g.,* **Exhibit I** annexed hereto ("Facebook Forked Over $60M to Acquire Trademark Assets from Meta Financial Group," *PYMTS.com*, December 15, 2021, https://www.pymnts.com/facebook/2021/facebook-forked-over-60m-to-acquire-trademark-assets-from-meta-financial-group/).

79.     Facebook's acquisition of third-party META-formative marks is an admission that Facebook's conduct infringes the trademark rights of Meta — a company that uses the identical mark in the identical Industry that Facebook has entered, and which targets the identical consumer base that Facebook now targets.

80.     Having failed to acquire Meta, whether by willful intent or by a due diligence oversight, Facebook is now attempting to simply overwhelm Meta and drive it out of business by exploiting Facebook's unmatched resources, market dominance, and public relations machine, which has saturated social media, mainstream media, the internet, streaming, and television.

    **c**. **Facebook Had Prior Knowledge of Meta and Therefore, Willfully Infringed the META Mark**

81.     Upon information and belief, Facebook engaged in this egregious conduct despite its executives having significant and intricate knowledge of Meta, and the goods and services that Meta offers in the Industry under the META Mark.

82.     As long ago as August 2017, there was an email exchange between senior Facebook employees and Bolognino.  Facebook reached out to Meta in the first instance, lauding Meta's creation and presentation of "The LAB," an immersive and virtual experience held at Panorama.

Facebook described Meta's goods and services as "AMAZING" and "spectacular." Facebook and Bolognino then engaged in further discussion about Meta's products and services, leading Facebook to solicit Meta to collaborate with Facebook on future work. In fact, Meta and Facebook went on to jointly pitch their services for a project involving the use of AR and artificial intelligence technologies in an immersive dome experience.

83.     Earlier, in July 2016, there was an email exchange between Meta's Chief Strategy Officer and another now-senior Facebook employee (who previously worked at another company).

84.     In that exchange, Meta and Facebook specifically addressed Meta, Meta's goods and services, and the substantial press coverage received by Meta related to the groundbreaking AR, VR, and XR experiences it created in the Industry.

85.     The now-senior Facebook employee knew about Meta's business and, upon information and belief, its online presence, including its Twitter page and handle @METAbeyond, a concept which is now used as a marketing tool by Facebook and central to Facebook's new identity as transcending "beyond" the real world. *See* **Exhibit J** annexed hereto ("Creative X on how it formed Facebook's new Meta brand," *It's Nice That*, November 8, 2021, https://www.itsnicethat.com/news/creative-x-facebook-meta-branding-graphic-design-081121).

86.     Upon information and belief, armed with the clear knowledge of Meta's business, knowledge of Meta's distinct messaging mentioning the META Mark, and knowledge of Meta's goods and services, Facebook continued its unlawful appropriation of Meta's valuable intellectual property.

### d. **Facebook Tries to Hide its Efforts to Willfully Infringe the META Mark**

87.     On December 2, 2021, Meta sent Facebook a letter identifying Facebook's infringing conduct. *See* **Exhibit K** annexed hereto. In that letter, Meta articulated its goods and services, explained how Meta's and Facebook's goods and services overlap, are targeted to the

same consumers, and travel through the same channels of trade.  *Id.*  Meta also pointed out that the other META marks that Facebook acquired were naked assignments, did not have priority over the META Mark, and were for different goods and services to those offered by Meta.  *Id.*

88.     On December 17, 2021, Facebook disingenuously denied that Facebook does, or would, provide the same services as Meta in the Industry — stating that Facebook and Meta offered "**drastically different goods and services,**" and admitting that Meta offered "multi-sensory live experiences to engage audiences and consumers" while Facebook contrastingly was a "social technology company."  *See* **Exhibit L** annexed hereto (emphasis added).  As such, Facebook expected that "the parties [could] peacefully co-exist."  *Id*.

####    e.  **Facebook's Blatant and Willful Infringement: Experiential and Immersive Experiences**

89.     Totally contradicting the assurances it made just months earlier, on March 11, 2022, Facebook announced its intention to render identical services to those rendered by Meta in the Industry, to the identical consumers, at SXSW (an event where Meta built a significant status). Facebook — in conjunction with *Rolling Stone*, which previously lauded Meta's work as "groundbreaking" and Bolognino as a "VR mastermind" (*see* **Exhibit M** annexed hereto) — announced that it was holding an experience called "Creator House" at SXSW.  *See* **Exhibit N** annexed hereto.  Facebook held that experience on March 18 and 19, 2022.

90.     "Creator House" involved "content creation's créme de la créme" converging "tech and art in an entirely new dimension," and tackled "the blossoming future of the creator economy head-on," while being "supplemented by . . . cutting-edge activations."  *Id.*

91.     This very "créme de la créme" and the "creator economy" are the identical consumers of Meta's goods and services, being integral parts of the creator and consumer communities associated with the Industry that Meta has been involved with, and has helped

develop, for over a decade.

92.     Adding to the egregiousness of Facebook's infringing conduct, Facebook began to create and conduct other immersive experiences using the same artists Meta previously partnered with — at the same events and venues where Meta previously created and conducted experiences.

93.     For instance, Facebook curated Lady PheØnix for the "Creator House" event in March 2022. Lady PheØnix is the same creator that was previously selected by Meta to co-host "The Stranger Party," mentioned above, in November 2021. *See* **Exhibit O** annexed hereto (https://meta.is/experiences/the-stranger-party/).

94.     On April 11, 2022, Facebook, again in conjunction with *Rolling Stone*, announced that it was going to present "Rolling Stone Live" as part of Coachella 2022 — another event at which Meta had, for years, created and conducted experiences, and is widely known and respected. *See* **Exhibit P** annexed hereto.

95.     "Rolling Stone Live" presented the "second iteration of Creator House — a content creation hub" and was described as the "premier destination to celebrate … tech, creators, and so much more." Facebook again conducted various VR experiences at Creator House. *See* **Exhibit Q** annexed hereto.

96.     Likewise, Facebook has partnered with the same companies that had previously partnered with Meta to conduct experiences in the Industry.

97.     For example, from May to June 2022, Facebook conducted a VR and AR experience that allowed consumers to explore the landscape of the moon at The Smithsonian — the same institution with which Meta worked to provide an experience developed by Android Jones in March 2018.

98.     Even more recently, Facebook partnered with Balenciaga, Prada, and Thom Browne to allow consumers to use VR and AR technology to purchase those fashion brands'

clothes for their avatars in the metaverse — which is similar to Meta's previous, albeit far more revolutionary and advanced, work in providing VR and AR experiences with fashion brands such as Nike, Nieman Marcus, and Y-3, as well as Meta's 2016 work with immersive creators Superbright to build a first-of-its-kind XR and AR fashion show.

99.     Just weeks ago, from June 20 to 23, 2022, at Cannes Lions, Facebook conducted experiential and immersive experiences such as "Coachella x Palace of Versailles," the "Reels SuperStudio" and the "Horizon Worlds Pavilion" experiences, and hosted panels targeted at the consumer and creator communities associated with the Industry such as "Creators x Commerce" and "The Future of Creators and Connection." *See* https://www.facebook.com/business/events/cannes.

100.     Those experiences are identical to experiences that Meta has created and conducted, as well as the panels Meta has led, curated, and participated in, for over a decade.  Ironically, Meta partnered with Twitter to conduct an experiential and immersive experience at Cannes Lions in 2013.  Facebook's experiences and panels at Cannes Lion also targeted the identical businesses and creator and consumer communities associated with the Industry that form part of Meta's consumer base.

101.     Despite the above, Facebook still expects Meta to accept its baseless assertion that the parties' goods and services are "drastically different."

### f.   Facebook's Blatant and Willful Infringement: Targeting the Same Consumers

102.     As an additional slap in the face to Meta, Facebook has gone well beyond its efforts at Cannes Lions to squarely target, and directly engage, the identical creator and consumer communities that Meta has been involved with, and has helped develop, for over a decade.

103.    Just two months after Facebook falsely asserted the drastic differences between Meta and Facebook, Facebook articulated its new focus on targeting the identical creators and consumers of Meta's services and products during its 2021 Q4 Results Conference Call, stating that "this is **not something we're going to do on our own. The metaverse will be built by creators and developers**, it will be interoperable, and it will touch many different parts of the economy."   *See* **Exhibit R** annexed hereto (Facebook, Inc. Fourth Quarter 2021 Results Conference          Call,          February          2,          2022, https://s21.q4cdn.com/399680738/files/doc_financials/2021/q4/Meta-Q4-2021-Earnings-Call-Transcript.pdf (emphasis added)).

104.    Facebook has since implemented that new focus on a global scale — for example, Facebook has devoted an entire webpage and associated resources to "Creators for Meta" (*see, e.g.,* https://www.facebook.com/creators) and continually publishes material directed at courting creators (*see, e.g.,* https://about.fb.com/news/2022/02/how-black-creators-are-building-toward-the-metaverse/).

105.    Facebook also created Instagram pages such as "@metaopenarts" and Instagram tags such as "#metacurated," which contain creator-focused content and offer services and information that are identical to Meta's business offerings and squarely target Meta's customer base.

106.    For example, the "@metaopenarts" bio text states that "[w]e empower artists and build community through creativity by collaborating with organizations, artists and designers." *See* https://www.instagram.com/metaopenarts.   That is strikingly and confusingly similar to Meta's UNREALITY page which states that it "connects diverse immersive creatives, producers, and technologists" and comprises a "world-class community of multi-disciplinary talent, empowering next generation AR, VR, XR, IRL, URL and beyond." *See* http://meta.is/ur/.

107.    As recently as June 17, 2022, Facebook held a "Black Creator Day" experience to develop and support creators, which also involved an immersive video projection room and other AR experiences.

108.    Upon information and belief, Facebook has also funded creators' trips to key Industry events and experiences.

109.    The icing on the cake was Zuckerberg's June 21, 2022 announcement that Facebook was "[r]olling out more ways for creators to make money on Facebook and Instagram -- and sharing updates that will help creators build for the metaverse," which included "Creator Marketplace … testing a set place on Instagram where creators can get discovered and paid, and where brands can share new partnership opportunities." *See* **Exhibit S** annexed hereto (https://www.facebook.com/zuck/posts/rolling-out-more-ways-for-creators-to-make-money-on-facebook-and-instagram-and-s/10114534084040871/?_rdc=2&_rdr).

110.    Those products and services offered by Facebook, as well as Facebook's clear targeted of the creator communities associated with the Industry, are identical to Meta's products and services such as UNREALITY and the XCollection marketplace, and Meta's focus on developing and supporting creator communities since 2010.

111.    Intensifying daily, Facebook's infringing conduct is engulfing the entire Industry — as Facebook hosts more and more experiences with, and for, businesses and individuals across the globe, while targeting the identical consumer base as Meta, and the identical businesses and creator communities associated with the Industry.

## IV.    Facebook's Infringing Conduct Embodies a Textbook Reverse Confusion Case

112.    Upon information and belief, Facebook has knowingly and willfully become a direct competitor of Meta with full knowledge of Meta's reputation and the goodwill that Meta had built around the META Mark in the Industry.

113.    Both parties use META as their umbrella corporate name as well as a source identifier for their respective goods and services.

114.    Facebook's current good and service offerings, albeit at a much larger scale, are identical to those of Meta.

115.    Facebook's consumers are identical to those of Meta.

116.    Facebook's channels of trade are identical to those of Meta.

117.    This is a textbook reverse confusion case: as Facebook (the much larger, junior user) overruns Meta (the smaller, senior user) by virtue of its size, market power, advertising reach, and almost limitless resources, consumers are likely to mistakenly believe that Meta's products and services emanate from Facebook and that Meta is somehow affiliated or associated with Facebook.

118.    Despite its awareness of the Meta's Products and Services, Facebook continued to willfully infringe the META Mark and inflict significant and irreparable harm on Meta through its conduct in the Industry.

119.    Facebook has flagrantly disregarded Meta's federally recognized trademark rights and common law rights by callously usurping the META mark and saturating global media, social media, streaming, real world advertising, television, Web2, and Web3 with its use of the infringing META mark.

120.    Facebook's open and egregious infringement is clearly displayed on its website at https://about.facebook.com/meta, which provides information about the infringing goods and services that it offers, as well as at all of the experiences and events mentioned above which have been held by Facebook displaying the infringing META mark.

121.    These goods and services comprise Facebook's "vision" to infiltrate almost every corner of the Industry including by creating virtual social communities, immersive experiences,

virtual entertainment, and incubators for creators in the Industry (*see, e.g.,* **Exhibit T** annexed hereto ("Connect 2021: Our vision for the metaverse," *Meta,* October 28, 2021, https://tech.fb.com/ar-vr/2021/10/connect-2021-our-vision-for-the-metaverse/)) — all while openly and willfully violating Meta's trademark rights.

122.    The sources, experiences, goods, and services cited in the foregoing paragraphs reveal that Facebook's use of the infringing META mark covers the same general type of products and services offered by Meta in the Industry, and are targeted at the same creator and consumer communities in which Meta has been immersed, and has helped develop, for over a decade.

123.    Facebook's use of its infringing META mark is extremely likely to cause consumer confusion with Meta's use of the META Mark.

124.    In fact, Facebook's conduct has already caused actual confusion, as recently revealed by correspondence that Meta has received from consumers.

125.    Those consumers have showed actual confusion by asking Meta representatives whether Meta and its goods and services are now associated with Facebook.

126.    For example, a highly respected, successful, and sophisticated businessperson asked whether Meta's "The Stranger Party" was a "Facebook thing?"

127.    Meta's ability to operate as Meta has been eviscerated in the very Industry that Meta helped to build and thrive.

128.    Even more egregiously, despite its actual knowledge of Meta's goods and services, and Meta's continuous use of the Meta Mark, Facebook never attempted to minimize confusion or cease any of its infringing conduct.

129.    In fact, its infringing conduct has intensified.

130.    While Facebook is a multi-billion dollar international conglomerate and one of the world's most powerful companies, it cannot callously and arrogantly disregard the firmly

established and protectable trademark rights of a smaller business.

## V.   Facebook Has Destroyed the META Mark, and Has Substantially Benefited from Its Use of the META Mark

131.   Upon information and belief, because of its continuous and prevalent infringement of the META Mark: (i) Facebook has attracted immense investment, and derived substantial additional income and profits; (ii) Facebook has attracted a vast array of new consumers and users of its goods and services; (iii) Facebook has bolstered its reputation, improved its goodwill, and distanced itself from the globally unpopular and toxic former brand "Facebook"; (iv) Facebook has increased its revenue and profits, including by failing to remunerate Meta for its use of the META Mark; and (v) Facebook has been unjustly enriched.

132.   As a result of Facebook's conduct alleged in the foregoing paragraphs, Meta's business and the META Mark have been inextricably linked with, and eviscerated by, the veil of toxicity that has enshrouded Facebook — including allegations that Facebook knew its products detrimentally affected teen girls' health, enabled terrorist and hate groups, aided human trafficking and human exploitation, spread religious hatred, proliferated COVID and political misinformation, and even facilitated genocide in countries such as Myanmar — which have been extensively detailed in the media such as in the *Wall Street Journal's* "Facebook Files," subject to congressional investigations in the U.S. and similar investigations abroad (*see, e.g.,* **Exhibit U** annexed hereto), and subject to state and federal regulatory investigations (*see, e.g.,* **Exhibit V** annexed hereto (https://ag.ny.gov/press-release/2021/attorney-general-james-investigating-instagrams-impact-young-people)).

133.   As a result of Facebook's conduct alleged in the foregoing paragraphs: (i) Meta has lost the value of, and control over, the META Mark, and Meta's goodwill and reputation; (ii) the META Mark no longer exclusively designates Meta as the single source of high-quality, respected,

29

and ethical products and services, and does not distinguish Meta's products and services from others, in the Industry; (iii) Meta's entire business has been irreparably and irrevocably harmed; and (iv) Meta can no longer present itself to its consumers without them mistakenly believing that Meta's products and services emanate from Facebook and that Meta is somehow affiliated or associated with Facebook.

**FIRST CLAIM**
**FEDERAL TRADEMARK INFRINGEMENT**
**15 U.S.C. § 1114**

134.     Plaintiff hereby repeats and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

135.     Plaintiff owns all right, title, and interest in and to the META Mark, which is a valid and protectable mark.

136.     Meta owns two federally registered trademarks covering the META Mark, namely, U.S. Reg. No. 5,194,332 in International Class 35 and U.S. Reg. No. 6,055,841 in International Class 41.

137.     Defendant has used in commerce, without Plaintiff's permission, the META Mark in a manner that is likely to cause confusion or mistake or deceive purchasers as to the source of Defendant's services and/or cause consumers to mistakenly believe that there is an affiliation, connection, approval, sponsorship, or association of Plaintiff and/or Plaintiff's goods, services, and commercial activities, on the one hand, with Defendant and/or its respective goods, services, or commercial activities, on the other hand.

138.     Defendant's acts constitute infringement of Plaintiff's META Mark under 15 U.S.C. § 1114(1).

139.     As a direct and proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to suffer damage to its trademark rights, business reputation, and goodwill.

140.    Unless restrained, Defendant will continue to use one or more marks confusingly similar to the META Mark and will cause irreparable damage to Plaintiff.

141.    Plaintiff has no adequate remedy at law and is entitled to an injunction restraining Defendant, its respective officers, agents, and employees, and all persons acting in concert with Defendant, from engaging in further acts of infringement.

142.    Plaintiff is further entitled to recover from Defendant the actual damages that it has sustained and/or is likely to sustain as a result of Defendant's continuing wrongful acts.

143.    Defendant's conduct is both malicious and willful.  Plaintiff is further entitled to recover from Defendant the gains, profits, and advantages that Defendant has obtained as a result of its continuing willful, wrongful acts.

144.    In addition to Defendant's malicious and willful conduct alleged in the foregoing paragraphs, upon information and belief, Defendant culpably disregarded the risk of reverse confusion infringement.  In fact, Defendant had express knowledge of that risk since at least December 2, 2021, but proceeded anyway with its infringing conduct.

145.    Upon information and belief, at least since December 2, 2021, Defendant deliberately intended to eliminate Plaintiff from the Industry and as a competitor through its infringing conduct, despite having knowledge of the Meta business and META Mark.

146.    Because of the willful and malicious nature of Defendant's wrongful acts, Plaintiff is entitled to an award of exemplary damages under the common law, and treble damages, increased profits, and its reasonable attorneys' fees under 15 U.S.C. § 1117.

### SECOND CLAIM
### FEDERAL UNFAIR COMPETITION
### 15 U.S.C. § 1125(a)

147.    Plaintiff hereby repeats and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

148.   Plaintiff owns all right, title, and interest in and to the META Mark.

149.   Defendant's unauthorized adoption and use of a name and trademark that is nearly identical to Plaintiff's META Mark, in connection with services that are identical or nearly identical to those Plaintiff provides, as hereinabove alleged, constitutes a use in interstate commerce and a false designation of origin or false and misleading description or representation of goods and services in commerce, with knowledge of the falsity, which is likely to cause confusion, mistake, and deception, and in commercial advertising and promotion, misrepresents the nature, characteristics, qualities, and origin of Defendant's commercial activities, within the meaning and in violation of 15 U.S.C. § 1125(a).

150.   Defendant's unlawful acts in appropriating rights in the META Mark are and were intended to co-opt Plaintiff's goodwill for Defendant's own pecuniary gain.

151.   Defendant's use of the META Mark has caused and is likely to cause confusion and, unless enjoined, is likely to lead consumers to the mistaken belief that Defendant's services originate from or are in some way associated with, affiliated with, connected to, related to, or sponsored or approved by Plaintiff, or in the alternative, is likely to lead consumers to mistakenly believe that Plaintiff's services originate from or are in some way associated with, affiliated with, connected to, related to, or sponsored or approved by Defendant.

152.   Plaintiff does not now and has never sponsored or approved or authorized Defendant's use of the META Mark.

153.   The aforesaid and continuing acts of Defendant infringe Plaintiff's META Mark and constitute unfair competition in violation of 15 U.S.C. § 1125(a).

154.   Plaintiff has been damaged by said infringement and unfair competition and has no adequate remedy at law for Defendant's continuing infringement.

155.   Plaintiff is entitled to an injunction restraining Defendant, its respective officers,

agents, and employees, and all persons acting in concert with Defendant, from engaging in further acts of infringement and unfair competition.

156.    Unless enjoined, Defendant's continuing infringement will cause irreparable harm to Plaintiff.

157.    Plaintiff is further entitled to recover from Defendant the actual damages that it sustained and/or is likely to sustain as a result of Defendant's wrongful acts.

158.    Plaintiff is further entitled to recover from Defendant the gains, profits, and advantages that Defendant has obtained as a result of its willful wrongful acts.

159.    Because of the willful and malicious nature of Defendant's wrongful acts, Plaintiff is entitled to an award of exemplary damages under the common law, and treble damages, increased profits, and its reasonable attorneys' fees under 15 U.S.C. § 1117.

**THIRD CLAIM**
**NEW YORK COMMON LAW UNFAIR COMPETITION AND**
**NEW YORK GENERAL BUSINESS LAW § 360-O**

160.    Plaintiff hereby repeats and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

161.    Plaintiff owns all right, title, and interest in and to the META Mark.

162.    Consumers identify the META Mark exclusively with Plaintiff when used on, and in connection with, experiences, communities, products, and services in the Industry.

163.    Plaintiff has invested substantial time, labor, skills, resources, and effort to generate enormous goodwill in the META Mark and Meta business, and to obtain a strong reputation in the Industry.

164.    Defendant has infringed the META Mark by using an identical mark in relation to similar or identical experiences, communities, products, and services in the Industry.

165.    Defendant's use of the infringing META Mark is calculated to and is likely to create

confusion, and deceive and mislead consumers into believing that Defendant's goods, services, and commercial activities originate with or are authorized by Plaintiff or that Plaintiff is responsible for Defendant's goods, services and commercial activities, or in the alternative that Plaintiff's goods, services and commercial activities originate with or are authorized by Defendant or that Defendant is responsible for Plaintiff's goods, services, and commercial activities, all to the detriment of Plaintiff.

166.    Defendant's use of the infringing META Mark is also calculated to and is likely to cause confusion as to the source of Defendant's and/or Plaintiff's services.

167.    Defendant's use of the infringing META Mark is also causing actual confusion amongst consumers, as alleged herein.

168.    Defendant's unlawful acts are intended to misappropriate Plaintiff's goodwill and the META Mark for Defendant's own pecuniary, reputational, and other corporate gain.

169.    Upon information and belief, Defendant's unlawful acts have also been committed in bad faith — being willful and malicious infringement that is intended to eliminate Plaintiff from the Industry and as a competitor, as well as confuse the public and injure Plaintiff for Defendant's gain — despite Defendant having prior knowledge of the Meta business and META Mark.

170.    Defendant's acts as alleged herein constitute unfair competition under the common law of the State of New York (which remains enforceable pursuant to New York General Business Law § 360-o), and will, unless enjoined by this Court, continue to result in harm to Plaintiff's business, the META Mark, and goodwill associated with Plaintiff.

171.    Defendant's acts have caused, and are causing, significant and irreparable harm and damage to Plaintiff.

172.    Plaintiff has no adequate remedy at law and, and unless Defendant is permanently restrained and enjoined by this Court, such irreparable harm will continue.

173.    As a direct and proximate result of Defendant's actions as stated herein, Plaintiff has suffered damage to its reputation, the META Mark, and the goodwill associated with the META Mark.

174.    Plaintiff is entitled to exemplary damages as a result of Defendant's gross, willful and malicious wrongful acts alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests judgment against Defendant as follows:

1.      A permanent injunction enjoining Defendant, and its subsidiaries, partners, members, officers, agents, servants, employees, attorneys, and those in active concert or participation with them or any of them who receive actual notice of the order and judgment of this Court, from:

a.      any further use of any name, or trademark, which includes in whole or in part the term "Meta" or "META" in connection with goods, services and commercial activities associated with the Industry;

b.      using any other mark, word, name or symbol similar to Plaintiff's META Mark which is likely to cause confusion or cause a mistake or deceive in connection with goods, services and commercial activities associated with the Industry;

c.      infringing Plaintiff's rights in its aforesaid META Mark, or using any colorable imitation thereof in connection with goods, services, and commercial activities associated with the Industry; and

d.      continuing the acts of unfair competition;

2.      Pursuant to 15 U.S.C. § 1116(a), ordering Defendant to file with the Court and serve upon Plaintiff's counsel, within thirty (30) days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

3.      Awarding Plaintiff all of Defendant's profits, and Plaintiff's damages by reason of the acts of trademark infringement and unfair competition complained of, with said damages to be trebled pursuant to 15 U.S.C. § 1117;

4.     Awarding Plaintiff exemplary damages for Defendant's willful and reckless conduct and continuing unfair competition and infringement of Plaintiff's rights continuing after actual or constructive notice of the same;

5.     Awarding Plaintiff its costs, expenses, and reasonable attorneys' fees to the extent allowed by law; and

6.     Awarding Plaintiff such other or further relief as the Court may deem just and proper.


Dated:   New York, New York
            July 19, 2022

Respectfully submitted,

**PRYOR CASHMAN LLP**

_____
Dyan Finguerra-DuCharme
Robert J. deBrauwere
Felicity Kohn
Nicholas Saady

7 Times Square
New York, New York 10036
Tel. (212) 421-4100
Fax. (212) 326-0806
dfinguerra-ducharme@pryorcashman.com

*Attorneys for Plaintiff Meta*

37