# KIRKLAND & ELLIS LLP

601 Lexington Avenue
New York, NY 10022
United States

Dale M. Cendali, P.C.
To Call Writer Directly:
+1 212 446 4846
dale.cendali@kirkland.com

+1 212 446 4800

Facsimile:
+1 212 446 4900

www.kirkland.com

July 29, 2025

The Honorable Louis L. Stanton
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:    *MetaX LLC vs. Meta Platforms, Inc.*, Civil Case No. 1:22-cv-06125

Dear Judge Stanton:

While Meta Platforms Inc. ("MPI") endeavored to draft and submit with MetaX LLC ("MX") a joint letter pursuant to Your Honor's July 1, 2025 order regarding the case schedule (ECF No. 160, the "Order"), MX at the last minute refused to cooperate. To summarize the history, at 9:45 PT on Monday (7/28), counsel MPI sent to MX a draft of a short, neutral letter that laid out concise summaries of the parties' positions on the pending issues and asked MX's counsel to provide edits by no later than 2 pm (ET) on 7/29. For most of the day, MX's counsel ignored MPI's email without so much as responding and acknowledging receipt or stating that their side needs more time. MPI responded at 5:47 ET indicating it was working on the draft and at 7:03 pm (ET) it shared a completely rewritten draft that included a fulsome argument from MX's side and introduced new positions and arguments. It is only fair that MPI was allowed to respond and edit its positions in kind. Otherwise it would have been prejudiced by MX's conduct. MPI did just that and left MX's positions unedited but simply added MPI's own and returned the draft to MX at 10:45 (ET). There was plenty of time for MX's side to make further revisions and respond so MPI could file the joint letter. Yet at 11:17 (ET) it responded stating it would respond tomorrow (i.e., the day after the deadline). MPI therefore submits this letter unilaterally.

## I.    PLAINTIFF'S PRE-MOTION LETTER (ECF NO. 124)

On May 30, 2025, MPI filed its response to Plaintiff METAx LLC's ("MX") pre-motion letter. Dkt. 140.[1] As MPI explained, MX's letter reflects MX's attempt to complicate and delay this case and inflate MX's disgorgement demand by reneging on a thoughtfully negotiated agreement regarding scope of the relevant industry.

---

[1] MPI's positions are more fully stated in that letter, which MPI hereby incorporates.

## KIRKLAND & ELLIS LLP

The Honorable Louis L. Stanton`
July 29, 2025
Page 2

### 1. *MX's RFPs are Overbroad and Seek Irrelevant Data About Products Not at Issue*

MX's RFPs are disproportionate and improper under FRCP 26, and contravene the parties' agreement on the scope of discovery. MX initially sought financial data for each good or service MPI offered under its META mark. Dkt. 141-1 at No. 20. Given the facial overbreadth of that request and numerous of MX's other requests, the parties mutually agreed (nearly 2 years ago) on the definition for the relevant "Industry" (i.e., the types of goods and services at issue), Dkt. 42-16 at 2—which MX described as "the battleground for this dispute." *See* Dkt. 135 at 1-2. In May 2023, after protracted discussion and negotiation with MX, MPI agreed to produce documents sufficient to show financial data for its "Industry goods and services," *as the parties had agreed to define that term.* Dkt. 141-1 at No. 20. For 1.5 years, the parties relied on this agreement. But after MPI produced fulsome financial data for its Industry goods and services[2]—which showed MPI has ***not profited*** from them—MX about-faced and sought to expand financial discovery to products it had already conceded are not at issue (*i.e.*, Facebook and Instagram). *See* Dkts. 141-2 & 141-3.[3] It is this information—about products MX agreed long ago are *not* part of the relevant "Industry"—that is at issue in RFPs 68 and 69. And while MX now tries to avoid the Parties' agreement by saying it was not meant to limit the overall scope of discovery, this is a red herring. MX sought ***financial discovery on MPI's revenues*** in its First Set of RFPs—which it ***admits*** were limited by the agreed "Industry" definition. Dkt. 141-1 at No. 20.

Even if MX were not reneging on its agreement (it is), it still would not be entitled to the sweeping financial discovery it seeks because this information is irrelevant and disproportionate. MX's argument that the parties' goods and services are "identical" or "the same" is a fallacy. MPI offers various consumer headsets, wearables, and related metaverse hardware/software products (MPI's "Industry" goods and services) as well as consumer-centric social networking services. MPI also sells digital ad space on ***MPI's own*** social media services, Facebook and Instagram, and offers customer support and complementary consulting services to MPI's top customers about advertising on MPI's social media services to facilitate best practices on those services. In contrast, MX offers virtual, augmented, mixed, and extended reality ***in person*** events and event production services. In other words, if a company wanted a promotional installation at a live concert, MX might be hired to build one for that company. And if MPI wanted a promotional installation at a live concert, MPI would need to hire a company like MX to build it since MPI does not provide those services. The parties' services are dissimilar on their face and in such a situation, courts routinely refuse such overreaching RFPs. *See, e.g.*, *Surfvivor Media, Inc. v. Survivor Prods.*, 406

---

[2] MX complains that MPI produced only a single relevant financial document, but MPI agreed to produce documents *sufficient to show* its specified financial data and produced two fulsome spreadsheets reflecting that data that it agreed to produce. And MX itself also produced only two financial spreadsheets.

[3] MPI offered to produce its filed 10-K and 10-Q statements. But that was not sufficient for MX.

# KIRKLAND & ELLIS LLP

The Honorable Louis L. Stanton`
July 29, 2025
Page 3

F.3d 625, 635 (9th Cir. 2005) (discovery in trademark case limited to subset of defendant's products sufficiently related to plaintiff's products); *E. Iowa Plastics, Inc. v. PI, Inc.,* 2014 WL 2121502, at *6-7 (N.D. Iowa May 21, 2014) (refusing to compel financial documents on defendant's businesses unrelated to at-issue products).[4]

Nor can MX claim it is expanding into Instagram's and Facebook's markets to create a loophole in the agreed-upon definition. MX's Unreality platform (allegedly a job search service like LinkedIn for creators) remains in an invite-only format and has not launched any of these supposedly related services. Nor is there any indication it has taken any steps to do so. Moreover, MX's Unreality is not a substitute for or competitor of Instagram or Facebook and MX does not sell ad space. *Sunenblick v. Harrell*, 895 F. Supp. 616, 628-29 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 684 (2d Cir. 1996); *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002) (medical devices used same technology in different ways and thus were unrelated).

MX's RFPs are also grossly overbroad. RFP 68 includes 7 discrete subparts that seek gross and net revenue for ***many*** vaguely-defined goods and services, all of which relate to Facebook and Instagram (which MX conceded long ago are **outside** the "battleground" for this case). Dkt. 135-4 at 5. The services at issue include a plethora of advertising services, ad space sales, content sales, verification services, and more—none of which are in any way related to MX's services, all of which are ill defined, and all of which would require disproportionately burdensome efforts to gather highly sensitive and irrelevant data. And RFP 69 seeks virtually ***every internal*** financial statement or analysis that MPI created in the past four years. This alone renders it overbroad and disproportionate. Because RFP 69 covers the same goods and services as RFP 68, it also fails for the reasons discussed above.

## 2. *MPI's 30(b)(6) Responses Are Consistent With This Court's Directions*

This Court has twice stricken MX's RFPs seeking documents on MPI's *purchase* of META-formative marks from unrelated third parties. *See* Dkts. 42, 47, 49, 64, 68; Ex. 6 at 21:12-16. In both instances, MX argued (unsuccessfully) that MPI's purchase of such marks from third parties is relevant to calculating reasonable royalty damages here. Dkts. 42, 64. That argument fails, however, because the amount MPI paid to ***acquire*** a third party's mark is not relevant to reasonable ***royalty*** damages. Reasonable royalty damages are "seldom" used in trademark cases and are not appropriate where (as here) the parties have no history of ***licensing*** the mark at issue. *Apollo Healthcare Corp. v. Sol de Janeiro USA Inc.*, 2024 WL 4555822, at *11 (S.D.N.Y. Oct. 23, 2024) (Stanton, J.) (finding "no sufficiently reliable basis on which to calculate a [reasonable]

---

[4] *Accord Select Comfort Corp. v. Tempur Sealy Int'l, Inc.,* 2014 WL 5835337, at *9 (D. Minn. Nov. 3, 2014); *Coty Inc. v. Cosmopolitan Cosms. Inc.*, 2020 WL 3317204, at *2 (S.D.N.Y. June 18, 2020); *Bobrick Washroom Equip., Inc. v. Am. Specialties, Inc.*, 2011 WL 13128374, at *2 (C.D. Cal. Sept. 23, 2011).

## KIRKLAND & ELLIS LLP

The Honorable Louis L. Stanton`
July 29, 2025
Page 4

royalty" where parties never had or discussed any prior licensing arrangement and defendant never licensed mark to any party).  Nothing about MPI's **acquisition** of third parties' marks bears on its **licensing** of marks (let alone licensing of MPI's own marks).

MX tries to rewrite history by selectively quoting and mischaracterizing the Court's prior comments.  In the June 2024 conference, Your Honor indicated MX might try developing its record on its reasonable royalty damages theory by deposing those who would have participated in the **hypothetical negotiation of a reasonable royalty between MX and MPI**.  Ex. 6 at 9:22-25; 18:19-19:4. Consistent with this guidance, MPI agreed to provide a witness to testify about its trademark acquisitions **to the extent the agreements include a royalty for a license** and to testify "as to how MPI would have evaluated the terms in a hypothetical negotiation with MX," which is precisely what Your Honor indicated MX could seek. Ex. 7; Ex. 6 at 9:22-25; 18:10-19:4; 20:15-21. MX is not entitled to more.

## II.    DEFENDANT'S PRE-MOTION LETTER (ECF NO. 135)

On May 16, 2025, MPI requested a pre-motion conference to seek a protective order striking or modifying certain of MX's Rule 30(b)(6) Deposition Topics (the "Topics") because they are overbroad, vague, unparticularized, disproportionate, and violate the parties' prior agreement as to the relevant industry. Dkt. 135.[5]

Where Rule 30(b)(6) topics "are vaguely worded, seek irrelevant information, or are so overly broad as to make it impossible for the responding party to prepare its witness, courts may strike the topics." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 2022 WL 2702378, at *2 (E.D.N.Y. Feb. 11, 2022). *Id.* MX's Topics are just that and should thus be stricken/limited. More specifically:

*"Industry" Goods and Services Topics.*  Many Topics seek testimony about "Industry" goods and services.  As discussed above, this is a term for which the parties **mutually** agreed to a definition to clarify the scope of their obligations.  *See* Topics 11, 14, 21-22, 24-28, 31, 33-34, 40, 47-49, 50, and 54-55.  Defining the scope of the goods and services at issue is crucial to a trademark case as the core issue is "whether [defendant's] *related products* infringe on [the plaintiff's] senior mark." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005).[6]  MPI agreed to produce a witness on these Topics regarding the agreed on "Industry"

---

[5] MPI's positions are more fully stated in that letter, which MPI hereby incorporates.  MX did not submit a response to that letter.

[6] *See also, e.g.*, *Coty Inc. v. Cosmopolitan Cosms. Inc.*, 2020 WL 3317204, at *2 (S.D.N.Y. June 18, 2020) (plaintiff not entitled to discovery on non-infringing products); *Bobrick Washroom Equip., Inc. v. Am. Specialties, Inc.*, 2011 WL 13128374, at *2 (C.D. Cal. Sept. 23, 2011) (same).

## KIRKLAND & ELLIS LLP

The Honorable Louis L. Stanton`
July 29, 2025
Page 5

goods and services, but MX reneged on the definition and seeks to expand it beyond what the parties agreed and relied on for nearly two years. While MX argues that agreement did not at all limit the scope of discovery, MX is incorrect. The subjects at issue when the parties negotiated that agreement were the same ones at issue here, but MX is now taking inconsistent positions on what discovery is out of bounds—all in an effort to boost its disgorgement prayer because it now knows that the only products it previously said were in bounds were unprofitable.

MX also argues that the information it seeks about Facebook and Instagram is proper because the parties both provide advertising services. But the mere fact that goods and services are in the same general category (*e.g.*, music) does not make them related. Rather, the question is whether they are in the same specific industry segment such that they compete for the same consumers. *Sunenblick v. Harrell*, 895 F. Supp. 616, 628-29 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 684 (2d Cir. 1996) (goods not proximate where both parties offered "musical products" but one was jazz and the other rap, and so they did not compete); *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1092 (C.D. Cal. 2003). Also, goods and services that use similar technology in different ways are ***not*** related. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002) (medical devices both used thermology and infrared heat ID technology but in different ways and thus were not related). As discussed above, MX's and MPI's services are different products that do not compete for the same consumers. And the mere fact that the parties have trademark registrations in the same broad international class is irrelevant as the class system exists merely for the PTO's convenience. 2 McCarthy on Trademarks and Unfair Competition § 19:56 (5th ed.).

***"Marketing and Advertising for Others" Topics Are Improper.*** Topics 14, 24-28, and 35 seek testimony on MPI's "marketing and advertising for others." While MPI agreed to produce a witness on these Topics, MX's later positions in meet-and-confers show the parties disagree about what this means. While MPI understands this to mean marketing/advertising ***production and/or consulting services*** for third parties (at most, Meta's concierge Creative Shop), MX insists this somehow extends to MPI's ***sale of ad space*** on its social media platforms (which does ***not*** involve MPI providing any marketing or advertising services for third parties). MX's position is both nonsensical and shows MX failed to describe (as it must) each of these "noticed topics with 'painstaking specificity' as to the subject areas that are relevant to the dispute at issue." *DDK Hotels, LLC*, 2022 WL 2702378, at *2 (citation omitted). MX's Topics using this phrase are also disproportionate—as discussed above, there is no relationship between MPI's sales of ad space and MX's in-person event production services."[7]

---

[7] *See, e.g.*, *Gov't Emps. Ins. v. Lenex Servs.*, 2018 WL 1368024, at *3 (E.D.N.Y. Mar. 16, 2018) (striking overbroad and unparticularized 30(b)(6) topic); *DDK Hotels, LLC*, 2022 WL 2702378, at *6. Topic 19 is also irrelevant as market share/saturation are for antitrust cases, ***not*** trademark cases.

# KIRKLAND & ELLIS LLP

The Honorable Louis L. Stanton`
July 29, 2025
Page 6

*"Goods and Services <u>Related</u> to the [Plaintiff's] Goods and Services" Topics Are
Improper.*  The relatedness or proximity of goods or services is one of the *Polaroid* factors and
thus a legal conclusion. *RiseandShine Corp. v. PepsiCo. Inc.*, 2023 WL 4936000, at *2, *3
(S.D.N.Y. Aug. 2, 2023). In Topics 19 and 24-28, MX seeks a witness on MPI's "goods and
services ***related*** to the [Plaintiff's] Goods and Services."  Inherent to these Topics is a request
that MPI concede that certain of its goods and services are related to those of Plaintiff and then
prepare a witness to testify to those ***legal conclusions***.  This is improper, as "legal conclusions
should not form the basis for 30(b)(6) deposition topics."  In any event, MPI already offered to
produce a witness to identify MPI's "Industry" goods and services. Thus the "related" goods and
services Topics are unnecessary—MX knows its own goods and services, will have testimony
identifying MPI's goods and services, and can make the legal arguments comparing those things
as MX sees fit without testimony on such topics.

*Other improper Topics*:

- **Topic 46** seeks testimony on MPI's responses to MX's RFAs. Ex. 2 at 40. While MPI agreed
  to produce a witness on this Topic before responding to MX's most recent RFAs, MX's latest
  RFAs are grossly overbroad and improper; thus this Topic is similarly deficient and
  unparticularized.  *See, e.g.*, Dkt. 135-7. Any testimony should be limited to exclude those
  RFAs.
- **Topic 45** seeks a witness on MPI's RFP responses and related productions. This seeks
  improper discovery on discovery and privileged information.  Dkt. 135-2 at 39-40.
- **Topics 47-49** seek testimony on various valuation and similar reports that *may* be created in
  evaluating a trademark acquisition—all of which are unparticularized and irrelevant (as MPI
  already told MX it has no such reports) and should be stricken.
- **Topic 51** seeks testimony on MPI's "purchase of the META NASDAQ stock ticker,"
  Dkt.135-2 at 45. While MPI offered to testify "generally to MPI's change of its . . . stock
  ticker to META," *id.*, MX insists on having the details of the purchase (including cost).  But
  moneys paid to buy a stock ticker is irrelevant.  This Topic should be limited accordingly.
- **Topic 53** seeks analyses allegedly required by FASB accounting standards—which are
  insufficiently particularized, irrelevant, and require expert testimony and should be stricken.

The foregoing more than suffices to show that MX's Topics are irrelevant, overly broad,
unduly burdensome, disproportionate, and therefore warrant a protective order.  *See, e.g.*, *Izzo v.
Wal-Mart Stores, Inc.*, No. 215CV01142JADNJK, 2016 WL 409694, at *3-5 (D. Nev. Feb. 2,
2016) (granting protective order as to 30(b)(6) topics that were overly broad, unduly
burdensome, and disproportionate);  *DDK Hotels, LLC*, 2022 WL 2702378, at *2 (discussing
standard for protective orders and stating that "[i]n reviewing a Rule 30(b)(6) notice of
deposition, the Court considers whether the topics are 'proportional to the needs of the case, not
unduly burdensome or duplicative, and described with 'reasonable particularity.'"").

# KIRKLAND & ELLIS LLP

The Honorable Louis L. Stanton`
July 29, 2025
Page 7

## III.     ADDITIONAL OUTSTANDING DISCOVERY DISPUTES

### A.     Plaintiff's Search for Documents Responsive to RFP 18 and Deposition of Plaintiff's CEO/Founder Justin Bolognino

MPI asserts that it should be allowed to take a further 2-hour deposition of MX's CEO/Founder, Justin Bolognino.  MPI deposed Mr. Bolognino on March 19 and 20, 2025. During his deposition, Mr. Bolognino testified about MX's goods and services offered in connection with MX's at-issue marks and those it intends to offer in the future, MX's position as to the date on which it first used its marks in connection with certain goods and services, alleged instances of actual confusion, and the sole produced email chain with Mr. Bolognino and third party event producer Ms. Blatt in which she asked him to remove MX's logo from promotional materials for her company's event.  After Mr. Bolognino's deposition, MX served supplemental interrogatory responses identifying all of MX's goods and services offered in connection with its marks as well as the corresponding dates of first use.  These interrogatory responses also identify MX's allegedly intended goods and services.  The responses were verified by Mr. Bolognino. And, as noted above, MX also produced additional communications between Mr. Bolognino and Ms. Blatt relating to the reasons why Ms. Blatt asked Mr. Bolognino to remove MX's logo from promotional materials for her company.  MX further produced one additional document that appears to be proffered to show actual confusion and another in which an individual forwards to Mr. Bolognino a purported job outreach message to work for Meta's Reality Labs division.

Because these documents were each produced after Mr. Bolognino's deposition, MPI was deprived of the opportunity to ask him questions about them.  MPI asserts that these interrogatory responses and documents contradict Mr. Bolognino's testimony in that they add services not previously disclosed (though Mr. Bolognino testified to the accuracy of goods/services lists that had been produced as of the date of his deposition), services that MX allegedly plans to offer which were not previously disclosed, and important context to MX's claims of confusion which was not previously disclosed.  Moreover, Mr. Bolognino verified the interrogatory responses and is a participant on the newly-produced emails.  Given the foregoing, MPI should be granted leave to take an additional 2-hour deposition of Mr. Bolognino in his individual capacity.

The Parties are continuing to meet and confer about these issues and will update the Court if there are further developments.

### B.     Seven Documents Clawed Back by Defendant for Privilege

# KIRKLAND & ELLIS LLP

The Honorable Louis L. Stanton`
July 29, 2025
Page 8

MX's arguments are procedurally improper and baseless: Procedurally, MX violated the stipulated 502(d) Order by demanding that MPI produce the subject documents for in camera review without first filing a motion with the Court to challenge MPI's privilege designations.  Dkt. 55 ¶ 9.  MPI already told MX that it will submit the documents for in camera review if MX files its motion.  MX seeks to avoid its burden.

Additionally, MX already waived its challenges to the 7 documents at issue: All 7 of these documents appeared on a challenge log that MX served, and all 7 were dropped from a later log that MX served alongside a letter *expressly stating* that MX had opted to drop many of its challenges.  MX sent that letter in *November 2024.*[8]  MX's arguments as to two of these documents are also either moot or premature as MPI agreed to produce one document without redactions and another with redactions removed from the material that MX argues is no longer privileged because it overlaps with information shared with Rolling Stone[9] (though MPI will keep unrelated redactions in place).

MX's arguments also fail on substance: Each of the remaining documents reflects legal advice, requests for legal advice, and/or communications with lawyers.  As such, they each contain privileged information that was appropriately (and narrowly) redacted.

## C.    Two Redacted St. Dennis Deposition Exhibits

MX misrepresents Ms. St. Dennis's testimony and the documents at issue.[10]  This dispute is also moot as MPI agreed to un-redact any statements in Exhibits 19 and 21 that pertain to the substance of Ms. St. Dennis's March 2022 email to Rolling Stone regarding MX's threatened TRO. [11]

Additionally, as to Exhibit 19, Ms. St. Dennis testified that it *does* contain legal advice.  And there has been no ruling that *all* legal advice conveyed from Mr. Minden to Ms. St. Dennis has been the subject of a privilege waiver—it has not.  As to Exhibit 21, MX's counsel showed Ms. St. Dennis the *redacted* document.  Unsurprisingly, when shown a *redacted* message thread from 2022 (3 years ago), Ms. St. Dennis testified that it did not discuss legal advice.  To be sure, the unredacted portions of that document do not (which is why they were produced without redactions).  And Ms. St. Dennis subsequently clarified that she does not remember what is under the redactions in Exhibit 21—meaning her testimony could only have been about the unredacted portions of those documents.

---

[8] MPI is willing to submit the relevant correspondence to the Court either in advance of the upcoming conference or alongside any briefing that occurs on this issue.

[9] MPI does not concede that privilege was waived in any of that material.

[10] MPI is willing to submit the relevant testimony to the Court either in advance of the upcoming conference or alongside any briefing that occurs on this issue.

[11] MPI does not concede that privilege was waived in any of that material.

## KIRKLAND & ELLIS LLP

The Honorable Louis L. Stanton`
July 29, 2025
Page 9

### D.     MPI's Responses to Plaintiff's Second Set of Requests for Admission

MX served a set of 83 RFAs, virtually all of which were improper and failed to comply with Federal Rule of Civil Procedure 36.  MPI responded to those RFAs to which it could formulate a response.  MX then served MPI with a 6-page, single-spaced letter raising a plethora of disputes.  And MX sent its letter concurrently with pushing a variety of other meritless disputes.  Additionally, Ms. St. Dennis's deposition occurred in the intervening time.  MPI has worked expeditiously to respond and, in any event, served its response on MX today.

KIRLAND & ELLIS LLP


By _____ */s/ Dale M. Cendali* _____