September 25, 2025

Vɪᴀ ECF

The Honorable Valerie Figueredo
United States District Court
Southern District of New York
500 Pearl Street, New York, NY 10007-1312

> Re:    ***METAx LLC v. Meta Platforms, Inc.*, Civil Case No. 1:22-cv-06125**

Dear Judge Figueredo:

In accordance with Your Honor's August 26, 2025 and September 3, 2025 orders (ECF Nos. 170 and 173, the "Orders"), Plaintiff METAx LLC ("Plaintiff" or "MX") and Defendant Meta Platforms, Inc. ("Defendant" or "MPI") (together, the "Parties") submit this joint letter summarizing the disputes to be addressed at the Discovery Hearing set for October 2, 2025.

## I.    PLAINTIFF'S PRE-MOTION LETTER (ECF NO. 124)

### A.    Defendant's Production of Certain Financial Information Further to RFPs 68 and 69

#### 1.    Plaintiff's Position:

RFPs 68 and 69 seek highly relevant financial information which is necessary for Plaintiff's damages calculations. The financial information sought by RFPs 68 and 69 is limited to the similar goods services both Parties offer, and those not currently offered by Plaintiff are in the natural zone of expansion for Plaintiff. In particular, RFP 68 targets only revenues received by Defendant from advertising services utilizing augmented reality ("AR"), virtual reality ("VR") and similar technologies (which are identical to services that Plaintiff provides) and revenues received by Defendant from subscription and verification services that it provides through its social media platforms. To be clear, despite Defendant's representations, Plaintiff does not seek all of Facebook and Instagram revenues, but only the revenues related to the limited services rendered on those platforms that use AR and VR.

Defendant inappropriately assumes the role of judge and jury by unilaterally determining that, **despite allegations in the Complaint, documents produced, deposition testimony, and publicly available information**, the Parties' services are not related and, therefore, Defendant is not required to produce the financial information about these specific services (which happen to be profitable for Defendant). Contrary to Defendant's bald assertions, the established Record clearly shows that the Parties render the same or closely related services. Indeed, the three

September 25, 2025

Page 2

categories of services that Defendant claims are distinguishable are really the same or closely related to those rendered by Plaintiff as shown below:

- **Both Parties Offer "Consumer-Centric Social Networking Services" to "Build Communities":** The Complaint contains 13 paragraphs with allegations about Plaintiff's "consumer-centric social networking service" and mentions it by its name — UNREALITY — 16 times. (*See* Compl. ¶¶ 42(g), 50-57, 64, 75, 106, 110.)  Plaintiff launched its UNREALITY social networking platform in 2019, slowed development of the platform during the pandemic, and then released the latest version in July 2025.[1]  (*See* Ex. 1.)  Indeed, the newest version of the UNREALITY platform was in its final stages of development at the time of Plaintiff's founder's deposition — but Defendant failed to ask questions to elicit more information about the platform, likely because Defendant wants to avoid the reality that UNREALITY is squarely at issue in this case.  The record clearly shows that both Parties have a social media platform that is "powered by META."  Narrowly tailored financial information relating to <u>specific segments</u> of Defendant's social media platforms is therefore relevant because <u>both</u> Parties offer "consumer-centric social networking services," that "build communities." (*See* Ex. 2 at 2 (inviting consumers to "connect with creative humans" and "join our vetted community").)

- **Use of AR and VR in Advertising:** Importantly, one part of this case is about <u>advertising</u> that uses AR and VR components (i.e., advertising using "Industry" tools).  Plaintiff has been offering advertising services with AR and VR components for fifteen years. (*See* Ex. 3.)  The very <u>purpose</u> of Plaintiff's social media platform UNREALITY is to advertise the work and businesses of its users regardless of whether there is "paid" digital ad space.  The language of RFP 68(a) reflects the goods and services stated in Plaintiff's Class 35 trademark registration, which are services that Plaintiff has rendered for over a decade.

  Defendant tries to confuse the issue by arguing that it sells "digital ad space" on its "own" social media services.  While true, that does not mean that the Parties' advertising services are not related.  Defendant sells ads that include AR and VR, including on Defendant's social media platforms.  (*See* Ex. 4.)  Further, Defendant's own witness, Ms. St. Dennis, repeatedly testified that Defendant provides advertising goods and services that utilize VR and AR, including at in-person events and experiences.  These advertising services are identical, or at the very least similar, to those offered by Plaintiff.

  As such, the record is clear that both Parties offer similar and/or related advertising services — including advertising services that use AR and VR and advertising utilizing VR and AR on

---

[1]  Implicitly recognizing the significance of UNREALITY, on September 12, 2025, Defendant asked Plaintiff to supplement seven RFPs that it believes relate to UNREALITY.  Defendant's request concedes that information relating to the Parties' social media platforms and services is relevant.

September 25, 2025

Page 3

Defendant's social media platforms — making the specific financial information sought relating to these specific types of advertising services offered by Defendant relevant to damages. Importantly, and at the very least, any "digital ad space" sold by Defendant that uses AR or VR is undoubtedly within the "Industry,"[2] and Defendant must produce financial information about the revenues earned from those sales.

- **"Customer Support and Consulting Services to [Defendant's] Top Customers About Advertising on Defendant's Social Media Services to Facilitate Best Practices on Those Services":** These services are specifically set forth in Plaintiff's META trademark registration: "*social media strategy and marketing consultancy focusing on helping clients create and extend their product and brand strategies.*" (Ex. 5.) Notably, Plaintiff's social media strategy and marketing consultancy services relate to how to best use <u>Defendant's platforms</u> for advertising. Because both Parties offer advertising consultancy services to help consumers create viral marketing campaigns on Instagram and Facebook, Defendant should produce narrowly tailored financial information pertaining to revenues generated from these services.

Defendant also advances additional, but flawed, arguments as to why the Parties' services are different. (ECF No. 163 at 2.) The Record shows that Defendant's conclusory arguments are wrong and, like above, both Parties offer the same services:

- **Defendant Claims: Plaintiff "offers virtual, augmented, mixed and extended reality in person events":** Defendant's own corporate witness testified that <u>Defendant also</u> offers in-person events and experiences that utilize AR and VR. (Ex. 6 at 65:17-18 (**"Most of the events that we put on would showcase AR, VR."**).) In fact, Defendant's corporate witness described in detail specific in-person marketing events that used AR and VR. (*See, e.g.*, *id.* at 106:9-114:24.) As both Parties use AR and VR in connection with advertising services, Defendant should produce narrowly tailored financial information about revenues generated from those services.

- **Defendant Claims: Plaintiff is only a "production company" like one that Defendant would hire to put on one of its own events:** Defendant is well-aware that Plaintiff is more than a "production company." Defendant tried to hide a critical document on its privilege log, but Judge Stanton ordered its production. (*See* ECF Nos. 119, 123.) In this non-privileged document, Defendant's in-house lawyer (who is the head of Defendant's trademark group) identifies Plaintiff as an ▮▮▮▮▮▮▮▮▮▮ (Ex. 7.) By its own admission that Plaintiff is an ▮▮▮▮▮▮▮▮ coupled with the services set forth in Plaintiff's incontestable

---

[2] The Parties' agreed-upon "Industry" definition is "the industry involving goods and services that utilize augmented reality, virtual reality, extended reality, mixed reality, and other similar immersive and experiential technologies." (ECF No. 42-16 at 1.)

September 25, 2025

Page 4

trademark registration and the documents Plaintiff has produced, the narrowly tailored financial information relating to Defendant's advertising is relevant and should be produced.

In addition to the identical and/or similar services that the Parties provide, Defendant ignores that in a trademark infringement case, it is not only about what the Plaintiff is offering when it files suit, but also whether Plaintiff is likely to "bridge the gap" and offer similar services as the Defendant in the future. *See The Better Angels Society, Inc. v. Institute for American Values, Inc.*, 419 Supp.3d 765, 777 (S.D.N.Y. 2019) (granting plaintiff's motion for summary judgment based, in part, on evidence that plaintiff "could expand further to an area of commerce similar to that of" the defendant). As shown below, Plaintiff is likely to bridge the gap and offer the services that Defendant offers that are subject to RFPs 68 and 69 (some of which the Plaintiff is already offering):

- Subscriptions: A "subscription service" involves social media users paying a recurring fee for exclusive features or content. Defendant offers subscription services. (*See* Ex. 8.) At deposition, Defendant examined Plaintiff on two exhibits that describe Plaintiff's plans to generate revenue from subscription services. In particular, one business plan from Summer 2021 identifies revenue streams that detail subscription agreements.[3] (Ex. 9 at 2-3.) Another slide deck Defendant made of the record at deposition also details Plaintiff's business plans from Fall 2021 to generate revenue from subscriptions.[4] (Ex. 10 at 2.) Subscription services are clearly a part of this case and Defendant must produce financial information relating to the revenues generated through subscription services.

- Verification Services: Verification services include providing a social media user with a symbol next to the user's account handle identifying to the consumer that the account is authentic. Defendant currently offers verification services as part of its subscription services in connection with its social media platforms. (*See* Ex. 11.) Verification services are commonplace and within the natural zone of expansion for any modern social media service (*see* Ex. 12), including UNREALITY. (*See* Ex. 2 at 3.) For these reasons, verification services are clearly a part of this case and Defendant must produce financial information relating to the revenues generated through verification services.

Defendant's conclusion that because Plaintiff's RFPs "relate[] solely to irrelevant services that are unrelated to [Plaintiff's] products and services," the RFPs are "grossly overbroad" is patently wrong. In support of its mistaken position that the information sought is "grossly

---

[3] At deposition, Defendant chose not to ask Plaintiff any questions about slides 34 and 35.

[4] Again, at deposition, Defendant chose not to ask Plaintiff any questions about slide 14.

September 25, 2025

Page 5

overbroad and disproportionate to the needs of this case," Defendant primarily relies upon the following cases, yet not one supports Defendant's position.

Plaintiff did **not** limit its case. As Defendant knows, the Parties **only** agreed to a definition of "Industry" for the purpose of **specific document requests.** Plaintiff expressly did not limit any other document requests or discovery to the "Industry." Plaintiff's correspondence, to which Defendant did not object, unambiguously confirms that the "definition of Industry … **does not seek to limit any aspect of Plaintiff's case, nor any of the allegations in Plaintiff's Complaint. Nor does it limit any future discovery of any kind**." (ECF No. 135-4 at 5, n.4 (quoting the same in another letter sent by Plaintiff in December 2022).) Plaintiff's written representations are consistent with its Complaint, which pleads that Plaintiff offers an array of goods and services to its consumers well beyond a single industry. (*See* Compl. ¶¶ 28-30.) Plaintiff's written representations are also consistent with two years of discovery — as document requests, interrogatories, requests for admission and deposition testimony from both sides over the last two years have gone well beyond any single industry. Indeed, Defendant produced thousands of documents and testified about advertising goods and services as well as Facebook and Instagram. Defendant is now reversing course to avoid producing financials on those services. As such, Defendant's argument that this Action is limited to the "Industry" is frivolous and must be rejected.

- *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005) held that discovery was properly limited to the goods that the plaintiff identified as infringing. Here, that would include Plaintiff's UNREALITY social media platform, which is identified 16 times in the Complaint and about which Defendant spent extensive time at deposition inquiring (and on which Defendant now seeks further discovery).

- *E. Iowa Plastics, Inc. v. PI, Inc.*, 2014 WL 2121502 (N.D. Iowa May 21, 2014) concerned whether the defendant should produce financial documents for goods sold under **different** marks used by its **other** businesses, which is not our fact pattern. Furthermore, both Facebook and Instagram, for example, are offered in connection with Defendant's house "Meta" mark.

- *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, 2014 WL 5835337 (D. Minn. Nov. 3, 2014) ordered the production of financial information for all mattress products, finding only that such information for non-mattress products was not relevant, and further recognized that, as here, the parties' stipulated protective order would protect against disclosure of highly sensitive financial information.

Defendants' other authorities involved fully developed factual records and did not, as here, decide whether certain categories of information were discoverable. Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha, 290 F. Supp. 2d 1083 (C.D. Cal. 2003) is a summary judgment decision where, unlike here, the plaintiff (i) did not own a federal trademark registration, (ii) admitted its

September 25, 2025

Page 6

goods were sold to different purchasers, and (iii) did not dispute that its goods were dissimilar in use from, and not complementary to, those of the defendant. Sunenblick v. Harrell, 895 F. Supp. 616 (S.D.N.Y. 1995) concerned a post-trial motion for judgment. Therma-Scan, Inc. v. Thermoscan, 295 F.3d 623 (6th Cir. 2002) is a summary judgment decision.

Defendant does not want to admit that the Parties' services are related or could be related because the revenues generated from those services is substantial. To avoid production, Defendant asks the Court to believe a fabricated narrative that the financial information sought is not relevant because Plaintiff purportedly limited its entire case to the "Industry." [5]

Plaintiff did **not** limit its case. As Defendant knows, the Parties **only** agreed to a definition of "Industry" for the purpose of **specific document requests.** Plaintiff expressly did not limit any other document requests or discovery to the "Industry." This is **not** a situation where, as in *D'Ambra v. Carnival Corp.*, 2025 WL 1724458 (S.D. Fla. Jun. 20, 2025), Plaintiff regrets the defined scope of discovery to which it clearly stipulated. Plaintiff's correspondence, to which Defendant did not object, unambiguously confirms that the "definition of Industry … **does not seek to limit any aspect of Plaintiff's case, nor any of the allegations in Plaintiff's Complaint. Nor does it limit any future discovery of any kind**." (ECF No. 135-4 at 5, n.4 (quoting the same in another letter sent by Plaintiff in December 2022).) Such specific, unequivocal statements are far from "boilerplate reservations of rights." And Defendant's partial quotation of a hypothetical from the same correspondence about simply accessing other platforms (without reference to their utilization of AR and VR) far from demonstrates that the term "Industry goods and services" does not encompass, for example, Defendant's use of AR and VR in Facebook, Instagram, and its related advertising goods and services.

Plaintiff's written representations are consistent with its Complaint, which alleges that Plaintiff offers an array of goods and services to its consumers well beyond a single industry. (*See* Compl. ¶¶ 28-30.) Plaintiff's written representations are also consistent with two years of discovery — as document requests, interrogatories, requests for admission and deposition testimony from both sides over the last two years have gone well beyond any single industry. Indeed, Defendant produced thousands of documents and testified about advertising goods and services as well as Facebook and Instagram. If anyone has "regrets," it is Defendant who realizes that such Record evidence opens the door to the production of financial information. The harsh reality for Defendant is that this case is well-beyond its "unprofitable" Reality Labs business unit.

Plaintiff is **not** seeking "sweeping financial discovery" via "grossly overbroad" document requests for "vaguely-defined goods and services." Just because Defendant claims they are does

---

[5] *See* n. 2, *supra* for the Parties' agreed-upon definition of "Industry" in connection with specific document requests.

September 25, 2025

Page 7

not make them so. Plaintiff's counsel made this point quite clear at the last hearing before Judge Stanton — Plaintiff is not seeking financial information about all sales on Defendant's platforms, but instead narrowly tailored services. (*See* Ex. 13 at 24:7-22.) Contrary to Defendant's arguments, the services included in RFPs 68 and 69 are actually in the "Industry." For example, Plaintiff seeks targeted revenue generated from (i) sales of VR/AR/XR advertisements, (ii) verification and subscription services offered to creators, and (iii) other limited categories stated in ECF No. 124. And, further minimizing any alleged "burden," RFP 68 seeks only "documents sufficient to show" these targeted revenues for specific goods and services, **not** all documents. And RFP 69 calls for specific financial statements and analyses necessary for Plaintiff's damages calculations. Nevertheless, Defendant is deliberately withholding these documents and associated testimony to prevent Plaintiff from calculating profits under the Lanham Act. Judge Stanton was very clear that this case is **not** bifurcated (*see id.* at 17:13, 21:25-22:1), yet Defendant is denying Plaintiff necessary discovery on damages with arguments more appropriate for summary judgment than a discovery motion (e.g., the intrinsic workings of both Parties' social media platforms and the Parties' respective consumers). Defendant cannot impose on Plaintiff its own determination of dissimilarity and ask the Court to decide liability in the context of a discovery motion to avoid its obligation to produce discovery related to damages. Because the financial information sought is narrowly tailored to the services about which both Parties have produced documents or testified as offered by each Party, and the case is not bifurcated, such financial information should be produced now.

Plaintiff seeks targeted revenue generated from (i) sales of VR/AR/XR advertisements, (ii) verification and subscription services offered to creators, and (iii) other limited categories stated in ECF No. 124. Defendant is deliberately withholding these documents and associated testimony to prevent Plaintiff from calculating profits under the Lanham Act. Judge Stanton was very clear that this case is **not** bifurcated. (Finguerra-DuCharme Decl. at Ex. XX.) Because the financial information sought is narrowly tailored to the services about which both Parties have produced documents or testified as offered by each Party, such financial information should be produced.

## 2. **Defendant's Position:**

MX seeks to compel production of financial data and documents regarding Instagram and Facebook—services that are different from those offered by MPI and not at issue in this case and which bear different trademarks (Facebook® and Instagram®) that are likewise not at issue in this case. To avoid this reality, Plaintiff (1) resorts to jargon and broad generalizations regarding the Parties' businesses that courts in this circuit and elsewhere have repeatedly found to be "meaningless" for purposes of evaluating whether products are similar for trademark purposes,

September 25, 2025

Page 8

and (2) sweeps aside the Parties' longstanding agreement as to the relevant "Industry" in this case.[6] In doing so, MX attempts to distract from and confuse straightforward discovery disputes governed by the proportionality standards in Fed. R. Civ. P. 26 by entangling those disputes with the merits of the case. MX's RFPs 68 and 69 are grossly overbroad and disproportionate to the needs of this case and do not comply with Rule 26. Accordingly, the Court should deny MX's requested relief.

MX invites the Court to accept a set of sweeping labels and buzzwords for the parties' goods and services—"consumer-centric social networking services," "digital ad space," "advertising company," "advertising services," "AR and VR," and so on—in an effort to blur the fundamental differences between the parties' *actual* businesses. In trademark cases, however, courts do not merely rely on catch-all descriptions of goods and services that sweep entire industries into a single bucket. Instead, courts look at the parties' *actual* goods and services, and how the parties *actually use* the trademarks at issue in the real world. *Lang v. Ret. Living Pub. Co.*, 759 F. Supp. 134, 138 (S.D.N.Y.), *aff'd,* 949 F.2d 576 (2d Cir. 1991); *J.T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883, at *17 (S.D.N.Y. May 8, 2013), *aff'd,* 586 F. App'x 8 (2d Cir. 2014).

And, when the analysis shifts from MX's intentionally broad labels to the on-the-ground reality of what MX actually offers, it reveals that MX's offerings are decidedly narrow. MX's own complaint describes its offerings as "*experiential and immersive experiences* for corporate and individual consumers" delivered principally through "*events and festivals*."[7] Dkt. No. 1 ¶37. Indeed, MX devotes several pages of its complaint to listing examples of its "experiences" at "events and festivals," including, *inter alia*: "'The Lab' experience at Panorama," a "curation of AR, VR, XR, and immersive dome technologies;" "'Flatland: A Romance of Many Dimensions' experience in a 150-foot dome" at Coachella; and "Hyperspective, an immersive 'Social Virtualized Experience' festival held in Los Angeles." *Id.* ¶40. Although MX claims its complaint confirms it "offers an array of goods and services to its consumers well beyond a single industry," MX ignores that it defined in its Complaint the "[I]ndustry" as "the industry involving immersive and experiential technologies, including augmented reality … , virtual reality … , and extended reality"—a definition that closely tracks language in the parties' later-agreed definition of "Industry" that MX concedes did not include Facebook and Instagram. *Id.* at 4. In short, MX is

---

[6] *E.g., Denimafia Inc. v. New Bal. Athletic Shoe, Inc.*, 2014 WL 814532, at *16–17 (S.D.N.Y. Mar. 3, 2014) (noting that "courts reject proximity analyses that are generalized at an overly high-level"); *Mejia & Assocs., Inc. v. Int'l Bus. Machs. Corp.*, 920 F. Supp. 540, 547-48 (S.D.N.Y. 1996) (rejecting plaintiff's attempt to define relevant goods and services broadly as "educational services" and stating that such **"broad" classifications are "meaningless for purposes of determining that products are proximate"** in a trademark case); *Q Div. Recs., LLC v. Q Recs., QVC, Inc.*, 2000 WL 294875, at *4–5 (D. Mass. Feb. 11, 2000) (collecting cases).

[7] All emphases added unless otherwise noted.

September 25, 2025

Page 9

an event-based experiential producer that integrates AR/VR components into physical installations at music festivals and similar gatherings.

Given that backdrop, when the parties negotiated the scope of products for which MPI would provide discovery (including financial information), they agreed—as explained below—on a definition of the relevant "industry" that *did not include Facebook and Instagram*. Initially, MX sought financial data and other information implicating *every* good or service MPI offered under its META mark. Dkt. No. 141-1 at RFP Nos. 8, 20-22. MX conceded that these were facially overbroad requests, and the Parties negotiated and agreed (nearly two years ago) to limit discovery to a defined "Industry" (*i.e.*, the types of goods and services at issue in this litigation). During these negotiations, MX described the "Industry" as "the battleground for this dispute." Dkt. 42-16 at 2. As part of that negotiation, MX's counsel explicitly recognized that Facebook and Instagram were *outside* the relevant "Industry." Indeed, when MX's counsel proposed language for the definition of the relevant Industry, it explained that MX's proposal "narrow[ed]" the relevant Industry. Dkt. 135-4 at 6. MX's counsel also made "clear that technologies which could not, in good faith and with common sense, be considered 'experiential' or 'immersive' technologies— such as *using an iPhone or computer to access social . . . websites like Facebook Blue, WhatsApp or Instagram*" were *outside the scope of the relevant industry*. *Id.* The parties ultimately agreed to MX's proposed, narrowed definition of the relevant Industry: "the industry involving goods and services that utilize augmented reality, virtual reality, extended reality, mixed reality, and other similar immersive and experiential technologies." Dkt. 42-16 at 2.

In reliance on and consistent with this agreement (and the scope of the case), MPI produced comprehensive financial data for its "Industry goods and services" (*i.e.*, data related to goods and services from MPI's Reality Labs business unit, which include various consumer headsets, wearables, and metaverse hardware/software products) in response to RFP Nos. 20-22. Dkt. 141-1.[8] This financial data demonstrated that MPI has not profited from its Industry goods and services. In other words, there were no profits for MX to disgorge from Meta.

---

[8] MX also claims its "written representations are also consistent with two years of discovery" because "Defendants produced thousands of documents and testified about advertising goods and services as well as Facebook and Instagram." *Supra* 5. But MPI's production of thousands of documents does not establish that the Parties' agreed discovery scope went "well beyond any single industry." Nor does the fact that MX elicited testimony from MPI's witnesses on "Facebook and Instagram" (after agreeing that the "Industry" did not include Facebook and Instagram) somehow unilaterally expand the Parties' agreement on the relevant "Industry" to include these irrelevant goods and services. That MX chose to focus on those irrelevant products in its depositions does *not* make them relevant, and MX cites no authority to the contrary. Nor have the 30(b)(6) depositions taken thus far involved the "Industry" goods and services. For example, Topic 21 relates to MPI's use of META-formative marks in connection with Industry

September 25, 2025

Page 10

In an attempt to salvage this remedy and artificially inflate its disgorgement damages, MX jettisoned the parties' agreement and sought financial discovery for Facebook and Instagram. *See* Dkts. 141-2 & 141-3 (RFP Nos. 65-67). MX claims it never intended to limit the overall scope of discovery, pointing to boilerplate reservations of rights to seek different discovery in the future.[9] But boilerplate reservations of rights do not permit MX to cast aside the parties' carefully crafted "Industry" definition because it no longer suits MX. "Such tactics undermine the spirit of the meet-and-confer process" and, "[i]f the Court allowed parties to disregard such discussion and stipulations simply because the propounding party was later dissatisfied with the results of such stipulation, . . . then parties would have no incentive to meet and confer in good faith." *D'Ambra v. Carnival Corp.*, 2025 WL 1724458, at * 4 (S.D. Fla. June 20, 2025) (denying motion to compel where Plaintiff stipulated to scope of discovery and after the results of the stipulation were not to her liking, attempted to circumvent the agreement by expanding the scope beyond the stipulation). MX agreed to forego years ago the discovery it now seeks to compel, and it is bound by that decision.

Significantly, even if MX's flip-flop was not foreclosed by its prior agreement on the scope of the relevant "Industry," the sweeping financial discovery it now seeks is neither relevant nor proportional to the needs of the case. *See, e.g., Coty Inc. v. Cosmopolitan Cosms. Inc.*, 2020 WL 3317204, at *2 (S.D.N.Y. June 18, 2020) (refusing to compel discovery relating to goods not at issue in trademark case because such discovery was neither relevant nor proportional to the needs of the case as required by Fed. R. Civ. P. 26); *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005) (discovery in trademark case limited to subset of defendant's products sufficiently related to plaintiff's products); *E. Iowa Plastics, Inc. v. PI, Inc.*, 2014 WL 2121502, at *6-7 (N.D. Iowa May 21, 2014) (refusing to compel financial documents on defendant's businesses unrelated to at-issue products).[10]

Under controlling case law, the "proximity" *Polaroid* factor does **not** focus on all uses that are or could possibly be made of an alleged trademark (in this case, the common word "Meta" used in the ordinary sense); it focuses **only** on those uses that **compete for customers**. *See, e.g.*, *Lang*, 949 F.2d at 582 (holding that **goods are not proximate** for trademark purposes where they

---

Goods and Services and Topic 22 relates to Industry Goods and Services. Both topics, and other similar ones, are slated for forthcoming depositions, in light of this pending dispute.

[9] MX argues that they only agreed to the industry definition for certain RFPs. But even if that is true, MX has not explained how defining the scope of the industry could be parsed out only to certain RFPs when the question of what goods and services are at issue is central to the entire case.

[10] *Accord Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, 2014 WL 5835337, at *9 (D. Minn. Nov. 3, 2014); *Coty*, 2020 WL 3317204, at *2; *Bobrick Washroom Equip., Inc. v. Am. Specialties, Inc.*, 2011 WL 13128374, at *2 (C.D. Cal. Sept. 23, 2011).

September 25, 2025

Page 11

"***neither compete nor serve the same purposes***."); *Denimafia*, 2014 WL 814532, at \*16 (same). Given this standard, courts routinely reject trademark plaintiffs' attempts—like MX's here—to define parties' goods and services broadly to manufacture a "proximity" argument.  For instance, in *Mejia*, the court found the parties' products were not proximate, despite the plaintiff's contention that both were in the same general class of "educational services." 920 F. Supp. 548. In doing so, the Court explained:

> *[T]his type of classification is so broad as to be meaningless for purposes of determining that the products are proximate*. … By increasing the level of generality, any products can be made to appear to fall in the same class. Aspirin and easy chairs could be characterized as 'comfort products.' Jet planes and roller blades could be characterized as transportation products.  *Such semantic exercises simply are not helpful in assessing likelihood of confusion*.

*Id.* ; *see also W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573–74 (2d Cir. 1993) (products "generally defined as personal care products" *not proximate* where they *"do not compete nor serve the same purpose"*); *Lang*, 949 F.2d at 582 ("Although both [plaintiff's] publishing house and [defendant's] magazine are in the field of publishing, this does not render them proximate.")*; Sunenblick v. Harrell*, 895 F. Supp. 616, 628-29 (S.D.N.Y. 1995) (Newman, J.), *aff'd*, 101 F.3d 684 (2d Cir. 1996) (goods not proximate and did not compete where both parties offered "musical products" but one was jazz and the other rap); *J.T. Colby*, 2013 WL 1903883 at \*17 ("Although the products of the parties each relate to books, they are not proximate in the marketplace. [Defendant] is a technology company that offers a computer software called iBooks that enables users to download and read ebooks.  The plaintiffs are publishing companies that use the iBooks imprint on their physical books and ebooks. These products do not directly compete.").[11]

Accordingly, courts also routinely deny overbroad discovery requests in trademark cases where the products or services are not sufficiently related. *See, e.g.*, *Surfvivor*, 406 F.3d at 635; *E. Iowa Plastics,* 2014 WL 2121502, at \*6-7; *Select Comfort*, 2014 WL 5835337, at \*9; *Coty*, 2020

---

[11] *Accord Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002) (medical devices both used thermology and infrared heat ID technology but in different ways and thus were not related); *Alta Vista Corp. v. Digit. Equip. Corp.*, 44 F. Supp. 2d 72, 77–78 (D. Mass. 1998) (noting that the "proximity" analysis is an "exacting" standard, rejecting plaintiff's broad characterization of parties' services as those of "media compan[ies]" and finding no proximity despite both companies involvement in promoting books, television, and movies); *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1092 (C.D. Cal. 2003); *Instant Media, Inc. v. Microsoft Corp.*, 2007 WL 2318948, at \*12 (N.D. Cal. Aug. 13, 2007) (parties' software products not proximate despite falling into same broad category and sharing some capabilities).

September 25, 2025

Page 12

WL 3317204, at *2; *Bobrick Washroom*, 2011 WL 13128374, at *2. The same result is warranted here.

MX's and MPI's goods and services do not compete for customers, as the Parties' businesses are plainly different, and the agreed scope of discovery necessarily reflects that reality. MPI offers consumer centric social media services (*i.e.*, Facebook and Instagram) which consumers use via mobile applications and websites to build communities. As part of those social media services, and much like a TV network selling commercial air-time for advertisements, MPI sells ad space on ***MPI's own*** social media services, Facebook and Instagram. MPI also offers customer support and complementary consulting services for MPI's top customers about advertising on ***MPI's own*** social media to facilitate best practices on those services. In contrast, as described above, MX primarily offers ***in-person*** virtual, augmented, mixed, and extended reality event production services.[12]

In its attempt to improperly broaden the scope of discovery by convincing the Court that the Parties' goods and services are the same, MX invokes superficial jargon to argue that it, too, offers "Consumer-Centric Social Networking Services," "has been offering advertising services with AR and VR components" akin to MPI's sale of digital ad space for years, and "Plaintiff's social media strategy and marketing consultancy services [also] relate to how to best use Defendant's platforms for advertising." *Supra* 2. But MX's generalized claims cannot disguise that MX is, as it describes itself, a "multi-sensory live experiences" company,[13] ███████████ ████████████████████████████████████████████████████ Ex. A (Bolognino Dep. Tr.) 151. And, when the parties' *actual* services are properly considered, the differences are apparent: MX might be hired to build a promotional installation at a live event to promote another company's brand, whereas MPI would need to hire a company like MX to help put on one of its live events (where MPI promotes its own brand and products), as MPI does not provide such event production

---

[12] MX argues MPI is "well-aware that Plaintiff is more than a 'production company,'" pointing to MPI's own document that identifies "Plaintiff as an 'advertising company.'" Tellingly, however, MX does not cite any of its ***own*** documents to support its claim that it is an advertising company, instead, it selectively quotes this email by an MPI employee that goes on to *confirm* that MX "specializes in creating 'multi-sensory live experiences' to promote its clients' brands.'" *Id.* And in any event, as discussed above, MX cannot manufacture a proximity argument where there is none simply by categorizing itself and MPI broadly as advertising companies (even assuming *arguendo* that broad categorization was accurate) and ignoring the fundamental differences in the parties' offerings.

[13] https://meta.is/; https://www.metajb.com/meta ("Meta creates and curates multi-sensory live experiences that ignite the human spirit with technology, design and storytelling."). MPI has not attached the webpages as exhibits, being mindful of the Court's instruction to keep attachments at a minimum. Should the Court prefer MPI to provide copies, MPI is happy to do so.

September 25, 2025

Page 13

services.[14]  And while MPI earns revenue by selling ad space on Facebook and Instagram, MX does not sell ad space at all.[15]

        Nor does MX's very recent (July 31, 2025) public launch of its Unreality platform change this analysis.[16]  Despite MX's attempt to paint Unreality as a "social media platform" akin to Facebook or Instagram, Unreality is simply ***not*** a substitute or competitor of Instagram or Facebook.  It is allegedly a job search service like LinkedIn for creators—*i.e.*, a "[p]rofessional [n]etworking" platform where people can "[s]hare [their] work" and "[d]iscover [j]obs and RFPs."[17]  MX's founder confirms that Unreality is a *unique* platform: he claims there "isn't really a good place on the internet to showcase your work" as Unreality is intended to do. *Id.*  Further differentiating Unreality from Facebook or Instagram is the fact that any potential users of Unreality need to qualify for access by submitting credentials establishing that they are a creator whose work meets certain quality standards.  No such criteria exists for accessing Facebook or Instagram, which is public to consumers generally. *Sunenblick*, 6 895 F. Supp. at 628-29, *aff'd*, 101 F.3d 684 (2d Cir. 1996); *Therma-Scan, Inc.*, 295 F.3d at 633.  And although MX makes vague claims of its advertising services and claims that "[t]he very purpose of Plaintiff's social medial platform UNREALITY is to advertise the work and businesses of its users," MX's founder and CEO admitted that MX does not intend to sell ad space on Unreality. *See supra* n.9. And individuals and businesses who might choose to create Unreality accounts would not use those accounts in place of Facebook or Instagram, just as many people have job search related profiles on LinkedIn and also use Facebook for other purposes.  Put simply, just as people purchase both jazz and rap musical albums to play at different times and for different purposes, consumers use Facebook and Instagram entirely differently than Unreality. *Id.* at 628-29, *aff'd*, 101 F.3d 684 (2d Cir. 1996).  In short, Unreality is simply not a substitute or competitor of Instagram or Facebook.[18]

---

[14] To the extent MX is arguing that MPI, by promoting its own AR and VR products at in-person events, is the same as MX's for-hire event production service, they are wrong.  MPI promotes its own hardware, software, and services at its promotional events, much like any company does through an in-person marketing event (such as a food brand handing out samples at a stadium).  Doing so certainly does not transform MPI into an event production company.

[15] *See* https://www.forbes.com/sites/lucianapaulise/2025/07/31/unreality-the-new-social-media-for-creative-careers/ (MX's founder confirming no intent to sell ads on MX's Unreality platform).

[16] Prior to this July 2025 announcement, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. A (Bolognino Dep. Tr.) 520-21, 526. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* At 151.

[17] *See* https://unreality.is/; *see also* https://vimeo.com/1104972272 (explaining that MX's Unreality service "help[s] you find the talent and projects you are looking for").

[18] Setting aside that Unreality is not a substitute or competitor of Instagram or Facebook, MX's claim that "both Parties have a social media platform that is 'powered by META,'" also misses the forest for the trees.  In assessing the similarity of the marks factor, courts consider "contextual clues that might serve to distinguish the marks" to

September 25, 2025

Page 14

Accordingly, these product offerings are **not** related or proximate under trademark law and thus not relevant to MX's claims. Discovery (particularly broad and detailed financial discovery) about unrelated, irrelevant products falls far outside the bounds of relevant and proportional discovery under Rule 26.

Finally, MX's arguments that the parties' businesses are similar because they both may at some point offer subscription services and/or verification services is absurd. If offering a company's services or goods on a subscription basis were enough to make two businesses related or proximate for the purposes of trademark law, then all of the myriad businesses that offer goods and services via subscription models—meal delivery, clothing rentals, magazines, movie streaming, wine clubs, razor delivery, etc.—would suddenly be proximate for trademark purposes. That is not the law. *See, e.g.*, *Stonefire Grill, Inc. v. FGF Brands, Inc.* 987 F. Supp. 2d 1023, 1050 (C.D. Cal. 2013) (rejecting plaintiff's argument that the goods "are the same because they both involve food" and "cater to 'people who are hungry or expect to be hungry'" as "preposterous"). Similarly, the fact that two businesses might offer user verification features with their otherwise different products does not render them related any more than an iPhone, kitchen appliance, and car would be related simply because the companies that sell them might offer certified preowned programs.

In sum, MX's RFPs not only violate the parties' prior agreement regarding the scope of discovery but are grossly overbroad and disproportionate and thus not in the scope of permissible discovery under Fed. R. Civ. P. 26.[19] *See* Dkt. 140 at 2. RFP 68, for example, seeks gross and net revenue for numerous vaguely-defined goods and services, all related to Facebook and Instagram—which MX conceded long ago are far removed from the "battleground" for this case. Dkt. 135-4 at 5. That RFP sweeps in a vast array of advertising, content, and verification services, none of which are related to MX's business, and all of which are ill-defined. Responding would require MPI to undertake an unduly burdensome effort to collect and produce highly sensitive and irrelevant data. RFP 69 is similarly overbroad and disproportionate as it improperly requests virtually ***every internal*** financial statement or analysis that MPI created in the past four years. Dkt. 140 at 3. Because RFP 69 covers the same goods and services as RFP 68, it also fails for the

---

consumers, including the context in which the mark appears. *J.T. Colby*, 2013 WL 1903883, at *16, *aff'd*, 586 F. App'x 8 (2d Cir. 2014). MPI's consumer-centric social media services are called Facebook and Instagram. MX's alleged social media platform is called Unreality. For Instagram and Facebook, the "from Meta" language appears only briefly in the Instagram or Facebook-branded environments only after you *login* to those platforms—while the "powered by META" language appears in the UNREALITY-branded environment. Given that these strong "contextual clues" distinguish the marks, consumer confusion is unlikely.

[19] *See also See, e.g.*, *Surfvivor*, 406 F.3d at 635; *E. Iowa Plastics*, 2014 WL 2121502, at *6-7; *Select Comfort*, 2014 WL 5835337, at *9; *Coty*, 2020 WL 3317204, at *2; *Bobrick Washroom*, 2011 WL 13128374, at *2.

September 25, 2025

Page 15

reasons discussed above. *Id.* MX's RFPs seek information regarding goods and services not at issue in this case and thus this discovery is neither relevant nor proportional to the needs of the case. *See, e.g., Coty,* 2020 WL 3317204, at *2; *Surfvivor,* 406 F.3d at 635; *E. Iowa Plastics,* 2014 WL 2121502, at *6-7.

**B.  Testimony Concerning Acquisition of Third-Party META Trademarks.**

**1.  Plaintiff's Position:**

On June 20, 2024, Judge Stanton directed Plaintiff to depose Defendant's senior executives and those involved in transactions to acquire META-formative marks on Defendant's behalf.  (*See* ECF No. 124 at 3; Ex. 14 at 9:23-25, 17:5.)  Specifically, the Court unambiguously directed Plaintiff to, *inter alia*, "**tak[e] the deposition** of the executives" and "talk[] to the people who acted" with respect to the transactions at issue.  (*Id.*)  In accordance with Your Honor's ruling, Plaintiff sought to depose Defendant on three 30(b)(6) Topics concerning such transactions: Topics 57, 59, and 60.  Defendant refused to designate a witness on these Topics.[20]

To excuse its refusals to testify, Defendant first offers a false compromise that it will provide a witness to testify about its META-formative "trademark acquisitions to the extent the agreements include a royalty for a license" and the trademark is "related to the Industry" (*see* ECF No. 141-7 at 3) despite its counsel having stated "unequivocally" on an August 14, 2024 meet-and-confer that, "having scorched the earth," **there are no such agreements**.  Defendant further argues that reasonable royalty damages are unavailable to Plaintiff and that the testimony sought by Plaintiff is not relevant to reasonable royalty damages.  But Defendant may not (a) unilaterally determine, especially at this discovery stage, whether Plaintiff is entitled to reasonable royalty damages, nor (b) unilaterally decide what information is "relevant" to any such assessment.  **Such an argument is premature — we are in the fact discovery phase, not the expert discovery phase**.

In either event, and contrary to Defendant's argument, courts use a reasonable royalty rate analysis to determine damages (particularly in **reverse confusion cases**) because of the difficulty of ascertaining actual damages.  *See, e.g., Gucci Am, Inc. v. Guess?, Inc.,* 858 F. Supp. 2d 250,

---

[20]    Defendant disingenuously argues that Judge Stanton has already determined this topic not relevant. Defendant's contention is patently false.  During a hearing in March 2023, Judge Stanton vacated Plaintiff's request related to the transactions at issue as "overbroad" and explicitly advised Plaintiff to narrow its request and seek the discovery later in the proceeding as the parties approached expert discovery.  During the subsequent, above-referenced hearing in June 2024, as explained, Judge Stanton directed the parties to take the deposition of those involved in the transactions at issue (thereby acknowledging the relevance of the transactions).  And just recently, Judge Stanton deferred a ruling referred the issue to Your Honor.

September 25, 2025

Page 16

253–254 (S.D.N.Y. 2012) (collecting cases holding that "courts have awarded or approved of 'reasonable royalty' damages if the evidence provides a sufficiently reliable basis from which to calculate them"); *QS Wholesale, Inc. v. World Mktg., Inc.*, No. SA 12-CV-0451, 2013 WL 1953719, at *4 (C.D. Cal. May 9, 2013) ("Even in cases without prior licensing agreements courts have awarded or approved of reasonable royalty damages if the evidence provides a sufficiently reliable basis from which to calculate them") (citations omitted and cleaned up).  Contrary to Defendant's argument, the price paid by a junior user to **acquire** — not just license — trademarks from a third party can provide the "sufficiently reliable basis" from which to calculate a reasonable royalty rate.  *See ITT Corp. v. Xylem Grp., LLC*, 963 F. Supp. 2d 1309, 1332–33 (N.D. Ga. 2013) (denying motions to exclude expert testimony and allowing reasonable royalty analyses based on (1) three separate transactions in which the junior user acquired a third party's trademark; and (2) the junior user's payment to a Spanish third party as part of a coexistence agreement).

Defendant's reliance on *Apollo Healthcare Corp. v. Sol de Janeiro USA Inc.*, 2024 WL 4555822 (S.D.N.Y. Oct. 23, 2024), a forward confusion case, is misplaced.  At **summary judgment** — not in connection with a **discovery dispute** regarding the production of financial information — Judge Stanton held that reasonable royalty damages were inappropriate on the facts specific to those parties, including particular testimony given by the plaintiff.  His Honor did not broadly hold that reasonable royalty damages are inappropriate in every trademark infringement case — indeed, the issue of whether reasonably royalty damages is an appropriate measure in a **reverse confusion case** (which is the present case) was not even before the Court.  Judge Stanton certainly did not address whether a junior user's acquisition of a third-party trademark is per se irrelevant to a reasonable royalty analysis in a reverse confusion case in a situation such as here — where one of the world's largest companies changed its house mark and bought up dozens of senior META-formative marks, but not Plaintiff's mark, despite its placement at the top of the search report that Defendant ran prior to its name change.  His Honor has made no finding as to the relevance of Defendant's third-party trademark acquisitions in this Action; His Honor instead advised the parties to take depositions about these transactions and then come back to the Court with respect to whether related documents should also be produced.  (ECF No. 141-06 at 21:12-16.)

Defendant is usurping Judge Stanton's role by unilaterally deciding that reasonable royalties are not appropriate in every trademark case, including those involving reverse confusion, an issue that has not yet been before the Court.  This case is not bifurcated and Judge Stanton expressly directed the Parties to explore this issue during deposition. The propriety of Plaintiff's theory of damages is not ripe for the Court's consideration.  Like in *Apollo*, such argument may be considered during summary judgment, not during a discovery motion.  Plaintiff is attempting to follow Judge Stanton's guidance to take the deposition and learn about the transactions rather than demanding the production of a limited set of documents (there are fewer than two dozen acquisitions).  Defendant has been hiding this information from Plaintiff from Day One in a

September 25, 2025

Page 17

transparent attempt by Defendant to shield itself from liability. Defendant should be required to produce a witness to testify about these limited transactions.

### 2. **Defendant's Position:**

MX cannot obtain discovery on MPI's trademark acquisition agreements with third parties by transforming its twice stricken RFPs into 30(b)(6) topics. No matter the discovery device through which these topics are funneled, they are improper because *acquisitions* with *third parties* are irrelevant to reasonable royalty damages. Indeed, this Court has vacated and stricken MX's RFPs seeking documents on MPI's purchase of META-formative marks from unrelated third parties. *See* Dkts. 42, 47, 49, 64, 68; Dkt. 141-06 at 21:12-16. In both instances, MX argued (unsuccessfully) that MPI's purchase of such marks from third parties is relevant to calculating reasonable royalty damages in this case. Dkts. 42, 64. That argument failed then and fails now because the amount MPI paid to **acquire** a **third party's mark** is not relevant to the calculation of reasonable royalty damages here involving a different mark and different party. In fact, as Judge Stanton recently confirmed, reasonable royalty damages are "seldom" used in trademark cases and are **not appropriate** where (as here) **the parties have no history of licensing the mark at issue**. *Apollo Healthcare Corp. v. Sol de Janeiro USA Inc.*, 2024 WL 4555822, at *11 (S.D.N.Y. Oct. 23, 2024) (Stanton, J.) (finding "no sufficiently reliable basis on which to calculate a [reasonable] royalty" where parties never had or discussed any prior licensing arrangement and defendant never licensed mark to any party). Nothing about MPI's **acquisition** of third parties' marks bears on its **licensing** of marks (let alone licensing of MPI's own marks).[21]

MX tries to rewrite history by selectively quoting and mischaracterizing the Court's prior comments. In the June 2024 conference, Judge Stanton indicated MX might try developing its record on its reasonable royalty damages theory by deposing those who would have participated in the hypothetical negotiation of a reasonable royalty between MX and MPI. Dkt. 141-06 at 9:22-25; 18:19-19:4. Consistent with this guidance, MPI agreed to provide a witness to testify about its trademark acquisitions to the extent the agreements include a royalty for a license and to testify "as to how MPI would have evaluated the terms in a hypothetical negotiation with MX," which is

---

[21] MX's cases are distinguishable. In *Gucci Am*, 858 F. Supp. 2d at 250, the court did not address whether third-party assignment agreements may be used to support a reasonable royalty or whether such agreements are discoverable. In *QS Wholesale*, the court limited its analysis to the parties' own licensing negotiations and did not rely on trademark-purchase agreements—let alone on agreements between the defendant and third parties. 2013 WL 1953719, at *5. Finally, MX cites a single 2013 decision from the Northern District of Georgia where the court denied a motion to exclude an expert's opinions regarding a reasonable royalty where the expert relied upon "implied royalty rates" from the accused infringer's prior acquisitions of trademarks. *ITT*, 963 F. Supp. 2d at 1309. This out-of-circuit case is unpersuasive, as there is no indication that the parties in that case actually challenged the discoverability of those agreements and is in conflict with the most recent, in-circuit cases cited above.

September 25, 2025

Page 18

precisely what Judge Stanton indicated MX could seek. Dkt. 141-06 at 9:22-25; 18:10-19:4; 20:15-21; Dkt. 141-07. MX is entitled to no more.

## II.    DEFENDANT'S REQUEST FOR PROTECTIVE ORDER REGARDING CERTAIN 30(B)(6) TOPICS (ECF NO. 135)

### 1.    Defendant's Position:

On May 16, 2025, MPI requested a pre-motion conference to seek a protective order striking or modifying some of MX's Rule 30(b)(6) Deposition Topics (the "Topics") because they are overbroad, vague, unparticularized, disproportionate, and violate the Parties' prior agreement as to the relevant "Industry." *See also* Dkt. 135 (MPI's pre-motion letter regarding its intent to seek a protective order).

Courts routinely grant protective orders where the Rule 30(b)(6) topics "are vaguely worded, seek irrelevant information, or are so overly broad as to make it impossible for the responding party to prepare its witness." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 2022 WL 2702378, at *2 (E.D.N.Y. Feb. 11, 2022). MX's Topics are just that and should be stricken or significantly limited.[22]

### a.    "Industry" Goods and Services Topics.

Many of MX's Topics seek testimony about the "Industry" goods and services. As discussed above, this is a term the Parties mutually agreed to define to clarify the scope of their discovery obligations. *See* Ex. B (2025-02-19 Corrected Notice of 30(b)(6) Deposition of MPI) Topics 11, 14, 21-22, 24-28, 31, 33-34, 40, 47-49, 50, and 54-55. Defining the scope of the goods and services at issue is crucial in a trademark case, as the core issue is "whether [defendant's] *related products* infringe on [the plaintiff's] senior mark." *Surfvivor*, 406 F.3d at 635.[23]

MPI agreed to produce a witness on these Topics to the extent they relate to "Industry" goods and services (*i.e.*, goods and services from MPI's Reality Labs business unit) but MX sought

---

[22] MX argues that MPI cannot particularize any "annoyance, undue burden or expense" warranting a protective order, *see infra* Section II.2. But MX's deposition topics seek specific irrelevant and disproportionate information and use specific terms that are so vague and unparticularized as to make it impossible for MPI to prepare a witness. No more is needed to warrant a protective order. *DDK Hotels*, 2022 WL 2702378, at *2. Nor does MX's one case hold otherwise. *Yatamar v. City of NY*, 2025 WL 1635966, at *3 (E.D.N.Y. June 9, 2025) (plaintiff's request for records was limited to a specific location, records, and a "narrowly-tailored" time period).

[23] *See also, e.g.*, *Coty*, 2020 WL 3317204, at *2 (plaintiff not entitled to discovery on non-infringing products); *Bobrick Washroom*, 2011 W6L 13128374, at *2 (same).

September 25, 2025

Page 19

to expand the definition to MPI's *irrelevant* goods and services, including goods and services (Facebook and Instagram) that MX long-ago conceded were not within the at-issue "Industry." MX is wrong that the Parties' long-settled agreement and course of conduct did not (and do not) limit discovery; as noted above, such agreements must be upheld to encourage parties to negotiate thoughtfully and reasonably and ensure that they receive the benefit of those negotiations. No changed circumstances justify MX's flip-flop on what discovery is or is not out of bounds. The only thing that has changed is that MX learned that the MPI goods and services MX previously said were in bounds were not profitable. Thus, MX's attempt to revise the relevant "Industry" definition is a transparent attempt to inflate its disgorgement prayer and should be rejected.

MX also argues that the information it seeks about Facebook and Instagram is proper because the Parties both provide advertising services.[24] But the mere fact that goods and services are in the same general category (*e.g.*, advertising) does not make them related. S*unenblick*, 895 F. Supp. at 628-29; *Therma-Scan*, 295 F.3d at 633. *See also* Section I.B, *supra*. As discussed above, MX's and MPI's services are *not related* because they do not compete for the same consumers. *Id.* The mere fact that the Parties have trademark registrations in the same broad international class is likewise irrelevant; the class system exists merely for the PTO's convenience, not to indicate that goods in the same class are necessarily related. 2 McCarthy on Trademarks and Unfair Competition § 19:56 (5th ed.).

### b. *"Marketing and Advertising for Others" Topics*

Topics 14, 24-28, and 35 seek testimony on MPI's "marketing and advertising for others." While MPI agreed to produce a witness on these Topics, MX's later positions in meet-and-confers show the Parties disagree about what the phrase "marketing and advertising for others" means. While MPI understands this to mean marketing/advertising production and/or consulting services for third parties (at most, MPI's concierge Creative Shop),[25] MX insists this somehow extends to MPI's **sale of ad space** on Facebook and Instagram which, as explained above, is plainly not relevant to the "Industry" at issue in the case nor related to MX's goods and services. MX also argues that MPI and MX offer "identical advertising and marketing services to others." *See infra* Section II.2.a. Tellingly, MX does not cite any of its **own** documents to support that it was an

---

[24] MX asserts below that MPI cannot unilaterally determine that Facebook and Instagram are not relevant. But MPI has not done so. As discussed above, MX's counsel has explicitly recognized that Facebook and Instagram were outside the relevant "Industry." Dkt. 42-16 at 2; *see also* Dkt. 135 at 6.

[25] Creative Shop is an in-house creative strategy team that partners with brands and agencies to help them create effective advertising campaigns for Facebook and Instagram. *See* https://research.facebook.com/blog/2020/4/measuring-creativity-a-conversation-with-creative-shop-research-manager-lara-andrews/.

September 25, 2025

Page 20

advertising company; instead, it selectively quotes an email by an MPI employee. *Id.* (*citing* Ex. 7). But the full sentence notes that MX ████████████████████████████████ ██████████████ *Id.* Nor does MX cite any other evidence from either MX or MPI for its position, instead making high-level assertions without any evidentiary support. This is insufficient. Accordingly, MX's Topics are overbroad and disproportionate to the needs of this case. Moreover, the fact that MX's Topics (as construed by MX) seek information regarding irrelevant goods and services also demonstrates that MX failed to describe each of these "noticed topics with 'painstaking specificity' as to the subject areas that are relevant to the dispute at issue." *DDK Hotels,* 2022 WL 2702378, at *2 (citation omitted). Accordingly, these topics are overbroad, unparticularized, and should be stricken.[26]

### c.  MX's Other Improper Topics:

- **Topic 46** seeks testimony on MPI's responses to MX's RFAs. Dkt. 141-02 at 40. While MPI agreed to produce a witness on this Topic before responding to MX's most recent RFAs, MX's latest RFAs are grossly overbroad and improper. *See* Section III.D.2, *infra*. Accordingly, this Topic is similarly deficient and unparticularized. *See, e.g.,* Dkt. 135-7. Any testimony should be limited to exclude MPI's responses to MX's latest overbroad RFAs.

- **Topics 47-49** seek testimony on various valuation and similar reports that *may* be created in evaluating a trademark acquisition—all of which are unparticularized and irrelevant (as MPI already told MX it has no such reports) and should be stricken.

Each of these Topics are irrelevant, overly broad, unduly burdensome, and disproportionate, and therefore warrant a protective order. *See, e.g., Izzo v. Wal-Mart Stores, Inc.,* 2016 WL 409694, at *3-5 (D. Nev. Feb. 2, 2016) (granting protective order as to 30(b)(6) topics that were overly broad, unduly burdensome, and disproportionate); *DDK Hotels,* 2022 WL 2702378, at *2 (discussing standard for protective orders and stating that "[i]n reviewing a Rule 30(b)(6) notice of deposition, the Court considers whether the topics are proportional to the needs of the case, not unduly burdensome or duplicative, and described with reasonable particularity") (internal quotations omitted).

### 2.  Plaintiff's Position:

Defendant does not meet the standard for a protective order with respect to any of the Topics.  Federal Rule of Civil Procedure 26 requires Defendant to show "good cause" for an order

---

[26] *See, e.g., Gov't Emps. Ins. v. Lenex Servs., Inc.,* 2018 WL 1368024, at *3 (E.D.N.Y. Mar. 16, 2018) (striking overbroad and unparticularized 30(b)(6) topic); *DDK Hotels,* 2022 WL 2702378, at *6. Topic 19 is also irrelevant as market share/saturation are issues in antitrust cases, ***not*** trademark cases.

September 25, 2025

Page 21

to protect Defendant from "annoyance, embarrassment, oppression, or undue burden or expense[.]"  Defendant must show these factors through "a **particular and specific** demonstration of fact, as distinguished from stereotyped and conclusory statements."  *Yatanar v. City of NY*, 2025 WL 1635966, at *2 (E.D.N.Y. June 9, 2025) (emphasis added).

Here, Defendant fails to particularize any alleged "annoyance, oppression, or undue burden or expense" associated with any of the deposition Topics.  Rather, Defendant claims that information relating to its advertising and marketing services and its Facebook and Instagram platforms is not relevant — a determination that is not for Defendant to make unilaterally and improper at this stage of discovery.

> ### a.  *"Marketing and Advertising" Topics 14, 24-28, and 35 Are Highly Relevant and Defendant Does Not Meet its Burden for a Protective Order.*

Topics 13, 24-28 and 35 relate to Defendant's marketing and advertising for others.  Defendant has not and cannot particularize any alleged "annoyance, oppression, undue burden or expense" warranting a protective order in connection with these Topics.  These Topics are highly relevant and targeted to an issue at the heart of this dispute: that Plaintiff and Defendant both offer marketing and advertising services to others.

As pleaded in the Complaint, Plaintiff offers marketing and advertising services to its consumers, being both corporate and individual consumers.  (*See* Compl. ¶¶ 28-29, 37-42, 44.)  Further, Plaintiff holds a federal trademark registration in Class 35 for advertising and marketing goods and services.  Indeed, **Defendant expressly admitted** — in a document that Defendant sought to hide as "privileged" before this Court's intervention — that Plaintiff is a ███████ ████████████████████  (Ex. 7 (emphasis added).)

Defendant offers **identical advertising and marketing services to others**.  This is affirmed by the fact that Defendant owns multiple federal trademark registrations for META in Class 35 for "Marketing, advertising and promotion services" (U.S. Reg. No. 5548121) and "advertising services" (U.S. Reg. No. 7559676).  It is further evidenced by documents produced by Defendant that show the suite of advertising goods and services that Defendant offers to businesses and individual consumers, including through its Creative Shop, on its Instagram and Facebook platforms, and through its advertising platform.  Deposition testimony from Defendant's marketing employees indisputably confirms the same.  Therefore, Defendant's claim that the Parties' goods and services are not related because "they do not compete for the same consumers" is once more disingenuous.

Defendant also tries to avoid testifying on these Topics by arguing that advertising and marketing falls outside the "Industry."  However, as above, this case is not limited to the

September 25, 2025

Page 22

"Industry."  (ECF No. 135-4 at 5, n.4.)  The same is affirmed by Plaintiff's written representations, the allegations in the Complaint and the course of discovery.  And even if this case were so limited, both the "Industry" and "Defendant's advertising and marketing for others" would include, for example, third-party advertisements utilizing AR or VR on Defendant's Instagram and Facebook platforms.

### b.  Defendant Has Not Met its Burden for a Protective Order to Prevent Deposition on Facebook and Instagram as Part of the "Industry."

Defendant also seeks a protective order to prevent testifying about Facebook and Instagram as part of Topics mentioning the "Industry."   However, Defendant fails to particularize any annoyance, oppression, undue burden or expense caused by testimony on these Topics.  Defendant's failure to meet the requisite standard dooms its motion for a protective order.

Defendant's sole basis for justifying its refusal seems to be that Defendant does not consider Facebook and Instagram to be relevant to this Action.  Defendant incorrectly (for reasons stated above) contends that this dispute is limited to the "Industry" and argues that Instagram and Facebook (and any related advertising goods and services) are outside this definition of "Industry."[27]

As an initial matter, as explained above, this Action is not limited to the "Industry." Further, Defendant's own admissions in depositions and in documents produced to Plaintiff indisputably establish that Facebook and Instagram utilize "Industry" goods and services, including AR advertising and other VR experiences and services.

Defendant is doing everything it can to avoid testimony concerning Facebook and Instagram — which it admits are its "profitable" goods and services — to minimize its potential liability.

### c.  Defendant's Attempts to Strike Other Topics Should Be Rejected.

- **Topic 46:** Defendant seeks to avoid deposition on this Topic, which concerns its Responses to Plaintiff's Second Set of RFAs.  Defendant's refusal to testify is puzzling because **Defendant itself noticed an identical Topic** in its 30(b)(6) deposition notice to Plaintiff, and Plaintiff prepared its witness (on over 220 RFA responses) who testified accordingly.   Further,

---

[27] Defendant also suggest that the parties' definition of "Industry" includes only "MPI Realty Labs business unit, but such an interpretation is far too narrow. Of course, if the parties simply wanted to limit "Industry" to Realty Labs, they could have simply defined "Industry" as "goods and services from MPI's Reality Labs."  Instead, the parties agreed to a much broader definition — *see supra*, n. 2.

September 25, 2025

Page 23

Defendant has not met its burden to show why a protective order should be granted for this Topic.

- **Topics 47-49:** Defendant again unilaterally claims that various reports created in evaluating a trademark acquisition are irrelevant. Those relevance determinations are improper and do not satisfy Defendant's burden of particularizing any harassment, burden or unnecessary expense required for this Court to issue a protective order.

## III.    ADDITIONAL OUTSTANDING DISCOVERY DISPUTES

### A.    Defendant's Request to Depose Plaintiff's CEO, Mr. Justin Bolognino for an Additional Two Hours (ECF Nos. 163 and 164)

#### 1.    Defendant's Position:

MPI requests permission to conduct a short additional (two-hour) deposition of MX's CEO and Founder, Justin Bolognino. MPI previously deposed Mr. Bolognino on March 19 and 20, 2025. During his deposition, Mr. Bolognino testified about (1) MX's goods and services offered in connection with MX's at-issue marks and those it intends to offer in the future, (2) MX's position as to the date on which it first used its marks in connection with certain goods and services, (3) alleged instances of actual confusion, and (4) the sole produced email chain with Mr. Bolognino and third party event producer Stephanie Blatt in which she asked him to remove MX's logo from his promotional materials for her company's event.

After Mr. Bolognino's deposition, MX served supplemental interrogatory responses that newly identified all goods and services allegedly offered by MX in connection with its marks, along with the corresponding dates of first use claimed by MX. These responses also disclosed additional goods and services that MX alleges it intends to offer in connection with its Unreality platform, which only recently launched. Mr. Bolognino personally verified these interrogatory responses.[28]

All of these materials were produced after Mr. Bolognino's deposition, depriving MPI of the opportunity to question Mr. Bolognino about their contents. *See, e.g.*, *George v. City of Buffalo*, 789 F. Supp. 2d 417, 436 (W.D.N.Y. 2011) (granting additional deposition time in light of party's

---

[28] In addition, MX produced further communications between Mr. Bolognino and Ms. Blatt, providing additional highly relevant context regarding Ms. Blatt's request that Mr. Bolognino remove MX's logo. MX also produced a new document that appears to be offered as evidence of actual confusion, as well as another document in which an individual forwards to Mr. Bolognino a purported job solicitation from Meta's Reality Labs division. MX has agreed to make Mr. Bolognino available for deposition related to these documents.

September 25, 2025

Page 24

newly produced documents). Moreover, the supplemental interrogatory responses are directly contrary to Mr. Bolognino's prior testimony because, *inter alia*, they include earlier claimed first use dates and introduce services not previously disclosed—none of which were available to MPI at the time of the original deposition. For instance, in MX's Interrogatory Responses–verified by Mr. Bolognino–MX claimed that its Unreality service would include "paid and unpaid advertising and marketing, including programmatic and contextual advertising." MX's Supplemental Responses & Objections to Defendant's Third Set of Interrogatories at 15. However, after Unreality's recent launch Mr. Bolognino participated in an interview with Forbes where he explicitly contradicted MX's Supplemental Interrogatory No. 18 response by stating that Unreality is **specifically designed** so that it will not include paid ads.[29] Accordingly, because Mr. Bolognino verified the interrogatory responses and is a direct participant in the newly produced email communications, his testimony regarding these matters is essential.[30]

In light of these developments, MPI submits that good cause exists to permit a further two-hour deposition of Mr. Bolognino in his individual capacity, limited to the topics and documents produced after his initial deposition. This additional examination is necessary to ensure a complete and fair record.

### 2.  <u>Plaintiff's Position:</u>

Defendant's request for an additional deposition of Plaintiff's CEO, Mr. Justin Bolognino, should be rejected because any perceived "necess[it]y" for a deposition on this issue is solely due to Defendant's own fault.  Defendant seeks a further deposition of Mr. Bolognino on certain responses to interrogatories which were not due under the Federal Rules of Civil Procedure until weeks **after** Defendant decided to take Mr. Bolognino's deposition over two days on March 19 and 20, 2025.  Both Plaintiff's initial and supplemental interrogatory responses were timely served. Defendant already spent two days deposing Mr. Bolognino on Plaintiff's goods and services, but served its interrogatories too late to be the subject of any questions, and now improperly seeks a third bite at the apple on this issue. Were examining Mr. Bolognino on these interrogatories truly "necessary to ensure a complete and fair record," then Defendant would not have taken Mr. Bolognino's deposition prior to Plaintiff's responses being due, and instead would have postponed

---

[29]    *See*    *https://www.forbes.com/sites/lucianapaulise/2025/07/31/unreality-the-new-social-media-for-creative-careers/*.

[30] MX argues below that MPI should not get a "third-bite at the apple." But MX does not cite any case for the proposition that MPI's request for additional limited time with Mr. Bolognino under these circumstances is inappropriate. Additionally, MX has indicated it intends to supplement its prior productions in response to MPI's RFPs regarding Unreality and MPI has requested documents depicting branding in the "new" version of Unreality—neither of which has happened yet and both of which may further justify additional time with Mr. Bolognino.

September 25, 2025

Page 25

his deposition to a later date (as most depositions occurred several weeks after Mr. Bolognino's deposition). Tellingly, Defendant did not do so. And while Defendant makes vague references to alleged "inconsistencies" between Mr. Bolognino's testimony and Plaintiff's supplemental interrogatory responses, Defendant has refused to specifically identify any such inconsistencies despite Plaintiff counsel's requests that it do so.

Defendant cannot seek additional deposition time based on either its own failure to serve its written discovery earlier or its own decision to take Mr. Bolognino's deposition prior to Plaintiff's interrogatory responses being due. Defendant "made [its] own bed and should be forced to lie in it." *Universal City Studios, Inc. v. Corley*, No. 00CIV.277(LAK), 2000 WL 621120, at *4 (S.D.N.Y. May 12, 2000). The Court should therefore reject Defendant's inappropriate request.

### B.  Documents Clawed Back by Defendant for Privilege (ECF Nos. 163 and 164)

#### 1.  Plaintiff's Position:

The 502(d) Order — to which Defendant agreed and was so-ordered by Judge Stanton — requires that documents clawed back for privilege and later challenged by a party ("Clawback Documents") must be submitted to the Court for *in camera* review. (ECF No. 55, ¶ 9.) Despite significant correspondence and meet and confers, Defendant refused to submit seven challenged Clawback Documents to the Court. Plaintiff now moves to compel Defendant to submit the remaining six Clawback Documents for *in camera* review.

On August 4, 2025, subsequent to Plaintiff's challenge and mere days before the Parties' original discovery conference before Judge Stanton, Defendant reproduced certain of the seven Clawback Documents, including an unredacted copy of META_MTX_00124626. This confirmed and was consistent with Defendant's repeated, baseless privilege claims in this Action. Additionally, during the deposition of Defendant's representative Ms. Falynn St. Dennis in July 2025, Ms. St. Dennis testified that in META_MTX_00224752 — one of the Clawback Documents — **no legal advice was discussed by any individual in that document.** (Ex. 6 at 231:1-232:12.) Despite Ms. St. Dennis' admission (and Defendant's subsequent August 4 reproduction), META_MTX_00224752 remains heavily redacted.

Defendant's arguments as to why it need not submit the Clawback Documents to the Court elevate form over substance. First, Defendant's contention that Plaintiff violated the 502(d) Order by requesting Defendant submit the Clawback Documents for *in camera* review in lieu of making a formal motion is another attempt to delay and waste further resources on motion practice where Defendant's privilege calls in this Action have already been overruled by this Court. Further, it provides Defendant yet another opportunity for gamesmanship by waiting until the eleventh hour

September 25, 2025

Page 26

to withdraw its privilege assertions and produce previously withheld material, as Defendant has done several times already, including with META_MTX_00124626.  Second, Defendant's claim that Plaintiff waived its ability to challenge these Clawback Documents because Plaintiff challenged these documents nearly a year ago but did not bring them before the Court at that time is also disingenuous.  In multiple emails and separate meet-and-confers concerning specifically the Clawback Documents at issue (rather than Defendant's comprehensive privilege log spanning tens of thousands of additional documents), Plaintiff reserved all rights and waived none to bring these Clawback Documents before the Court at an appropriate time.  That time is now.  And, if these documents are privileged, Defendant should have no issue with the Court's *in camera* review now.

### 2.  <u>Defendant's Position:</u>

MX's arguments are procedurally improper and without merit. Under the stipulated 502(d) Order, MX was required to file a motion with the Court to challenge MPI's privilege designations before demanding that MPI produce the subject documents for *in camera* review. *See* Dkt. 55 ¶ 9. Instead, MX bypassed this required step and directly requested *in camera* review. MPI has already made clear to MX that it will submit the documents for *in camera* review if MX files the appropriate motion. By refusing to do so until now, MX did not fulfil its procedural obligation.

In addition, MX waived its challenge to the documents at issue. MPI clawed back the documents over a year ago, and each appeared on a challenge log served by MX. On November 22, 2024, MX's counsel stated that MX had "opted to drop many of [MX's privilege] challenges" and provided a list of the remaining challenges. MetaX November 22, 2024 correspondence, Ex. C. None of the documents MX now challenges appeared on that list. *Id.* During extensive meet-and-confers following the November 22 correspondence, MX repeatedly confirmed that the November 22, 2024 list represented the complete "universe" of its privilege challenges and that it had "opted to drop" any others. *Id.* MX expressly represented that it did not intend to pursue or revisit privilege challenges over any documents *not included* in its November 22, 2024 list. MPI memorialized this understanding in writing on December 30, 2024, and reiterated it in subsequent emails on January 4, 2025, January 7, 2025, and January 10, 2025.  In those communications, MPI expressly noted that any disputes regarding documents *not* listed in MX's November 22, 2024 email had been resolved, withdrawn, or mooted by subsequent agreements, and that revisiting those challenges would be contrary to MX's prior representations. *See* Ex. D. On January 29, 2025, MX confirmed that it had reviewed MPI's prior emails and provided a further narrowed list of documents for which it maintained its privilege challenges, stating that the Parties were at an

September 25, 2025

Page 27

impasse as to those documents and reserving its right to move to compel as to that narrowed list, which again *did not include* the seven documents now at issue. *Id.*[31]

Finally, MX's substantive arguments also fail. The remaining documents at issue are internal MPI documents produced with narrow redactions. The withheld/redacted portions reflect legal advice, requests for legal advice, and/or communications with MPI's in-house legal counsel regarding intellectual property and/or data privacy issues (which is not relevant here anyway).[32] Accordingly, each document was properly redacted and clawed back by MPI pursuant to the 502(d) order in this case.

## C.  Redacted St. Dennis Deposition Exhibits (ECF Nos. 163 and 164)

### 1.  Plaintiff's Position:

Ms. St. Dennis, who the Court ruled waived attorney client privilege when communicating with third parties (ECF No. 119), admitted in her deposition that certain redacted documents did not contain legal advice.  For example, Ms. St. Dennis testified that **no legal advice was discussed by any individual in** St. Dennis Deposition Exhibit 21 (META_MTX_00224893), which is a redacted chat thread between non-lawyer employees of Defendant.  (Ex. 6 at 232:13-233:14.)  Ms. St. Dennis also admitted that the redacted content within St. Dennis Deposition Exhibit 19 (META_MTX_00266887) only contained information over which Judge Stanton had ruled that any attorney-client privilege or work product protection had been waived.  (Ex. 6 at 224:10-226:12.)

Following Ms. St. Dennis' deposition, Plaintiff requested that Defendant produce unredacted copies of META_MTX_00266887, META_MTX_00266887, and META_MTX_00224752 (one of the Clawback Documents referenced above), or submit them for *in camera* review.  On August 4, 2025, Defendant reproduced these documents with narrower, yet still significant, redactions and refused to take further action.  Considering Ms. St Dennis' admissions as well as Defendant's history of improperly withholding documents for privilege, Plaintiff reiterates its request for production of META_MTX_00224893,

---

[31] Further, MX's arguments regarding three of the documents are moot. MPI produced one challenged document without redactions (META_MTX_00124626) another virtually in full, with one narrow redaction (META_MTX_00266887), and another with redactions removed (META_MTX_00224893), as to the material that MX claims is no longer privileged due to overlap with information shared with Rolling Stone (while maintaining unrelated redactions). MPI does not concede that privilege was waived as to any of this material.

[32] MX argues above that Ms. St. Dennis testified that certain of these documents were not privileged. As discussed in Section III.C.2, Ms. Dennis was only able to see the unredacted portions and could not recall what was under the redactions.

September 25, 2025

Page 28

META_MTX_00266887, and META_MTX_00224752 or their submission to the Court for *in camera* review.

      **2.** <u>**Defendant's Position:**</u>

      This dispute regarding Exhibits 19 (META_MTX_00266887) and 21 (META_MTX_00224893) is moot, as MPI agreed to unredact any statements in Exhibits 19 and 21 that pertain to the substance of Ms. St. Dennis's March 2022 email to Rolling Stone regarding MX's threatened TRO, which MX claims is at issue. And indeed, MPI has since produced less redacted versions of both of those documents.

      In addition, MX misrepresents Ms. St. Dennis's testimony and the corresponding Exhibits at issue. Ms. St. Dennis testified that Exhibit 19 contains legal advice from Scott Minden, a MPI in-house attorney. *See* Ex. E (St. Dennis Dep. Tr.) 225:24-226:6 ████████████████████████ ████████████████████████████████████████████████████ In addition, Exhibit 21 was a redacted document shown to Ms. St. Dennis. The redactions were applied to portions of the document that contained legal advice. When presented the redacted document from 2022—more than 3 years before her deposition—Ms. St. Dennis testified that it did not contain legal advice, since Ms. Dennis could not *see* the legal advice protected by the redactions. Ms. St. Dennis subsequently clarified that she does not remember what is under the redactions in Exhibit 21. St. Dennis Deposition 254:15-21 ("Q. And then if you will look with me at Exhibit 21…Do you remember what's underneath the redactions? A. No."). Accordingly, Ms. St. Dennis's testimony that Exhibit 21 did not contain legal advice was only referring to the *unredacted* portion of the document shown to her by MX's counsel.

    **D.** <u>**Defendant's Responses to Plaintiff's Second Set of Requests for Admission (ECF Nos. 163 and 164)**</u>

      **1.** <u>**Plaintiff's Position:**</u>

      On July 7, 2025, Plaintiff served Defendant with a letter identifying numerous deficiencies in Defendant's Responses to Plaintiff's Second Set of RFAs ("<u>Defendant's Responses</u>"), including that Defendant failed to respond to more than 60 RFAs. On July 15, Defendant informed Plaintiff that it was looking into the issues and "would provide a substantive response in the next few days." On July 29, just hours before the Parties' summaries of outstanding discovery issues were due to the Court, Defendant finally served its letter response on Plaintiff, which confirmed that many deficiencies with Defendant's Responses relate to issues already pending before the Court, including the scope of Defendant's goods and services at issue in this Action and the Parties'

September 25, 2025

Page 29

"Industry" definition. Plaintiff expects that the Court' ruling on those issues — which are covered in Section I of this joint letter — will narrow the parties' disputes with respect to Defendant's Responses, and that the Parties will then be able to work through any remaining issues with without further Court intervention.

## 2. <u>Defendant's Position:</u>

MX's Second Set of Requests for Admission to MPI contained 83 RFAs, almost all of which were improper (as explained below) and failed to comply with Fed. R. Civ. P. 36. *See* Ex. F (2025-03-10 MX's Second Set of RFAs to MPI). On July 7, 2025, Plaintiff served Defendant with a letter about alleged deficiencies in MPI's Responses to MX's Second Set of Request for Admission. MPI timely responded on July 29, 2025 to MX's alleged common and specific deficiencies.

### a. *MetaX's Alleged Common Deficiencies.*

***First***, MPI did not, as MX claims, improperly decline to answer any of MX's Requests for Admission. Rather, a majority of MX's Requests are fundamentally overbroad, unduly burdensome, vague, and ambiguous, such that the Requests fail to meet the basic requirement that RFAs be clear, concise, and capable of being answered with a simple "admit" or "deny." *See, e.g.*, *Carver v. Bank of New York Mellon*, 2018 WL 4579831, at *1–3 (S.D.N.Y. Sept. 25, 2018) (denying motion to compel further responses where RFAs used language that was "vague, ambiguous, or at a minimum, subject to dispute," and could not be "admitted or denied without explanation"); *Siani v. Suny Farmingdale*, 2009 WL 3254924, at *1 (E.D.N.Y. Oct. 7, 2009) (explaining that a "properly drafted [RFA] will ask that a party admit or deny ***one straightforward fact*** . . . so that it can be admitted or denied without explanation"). Accordingly, MPI was not required to respond to these flawed Requests.

***Second***, MPI's objections to certain terminology in MX's Requests—such as "aware of," "utilize" or "utilizing," "Defendant," and "Plaintiff's Mark"—on the grounds of vagueness, ambiguity, and overbreadth are entirely justified. The mere fact that a term may have a generally understood meaning or that it has appeared in other contexts does not make it suitable for use in an RFA. *See, e.g.*, *Coty Inc. v. Cosmopolitan Cosms. Inc.*, 2020 WL 3317204, at *3 (S.D.N.Y. June 18, 2020) (denying motion to compel responses to RFAs that "contain[ed] multiple defined and undefined terms" and were "not phrased so that they can be admitted or denied without explanation, a sine qua non for a proper RFA"). Moreover, the cumulative effect of the various deficiencies in MX's Requests exacerbates the problem. For instance, Request No. 58 asks, "Admit that before the Mark Change, you were aware of Plaintiff." However, MX defines "you" and "Defendant" to include an extensive list of entities and individuals—ranging from current and former affiliates, officers, and employees to unrelated third parties and representatives—regardless

September 25, 2025

Page 30

of their relevance or current relationship to MPI. As a result, MPI properly objected to this Request as impermissibly overbroad.

*Third*, MPI's objections to the term "Industry goods and services," as well as its decision to limit its responses to the use of its META-formative marks in connection with "Industry goods and services," are both appropriate and consistent. While the Parties initially agreed on a definition of the relevant "Industry" based on the scope of the case, MX has since attempted to broaden the definition of "Industry goods and services" to include services that MX previously acknowledged were outside the agreed scope. *See supra*, Section I.A.2. Given this history, MPI's objections to the use of this term in the RFAs were well-founded. Where MPI did respond to Requests containing this term, it did so only when the RFA could reasonably be answered as to the parties agreed-upon definition of the relevant industry and scope of discovery (*see* Section 1.B, *supra*) and did so consistently with that understanding.

*Fourth*, MPI's objections to MX's definition of "META-formative Mark" are also well-founded. MX's RFAs are not confined to META-formative marks used in the United States with the goods and services that are actually at issue in this litigation consistent with the Parties' previously agreed definition of "Industry." Consequently, both the definition of "META-formative Mark" and the Requests employing that term are overbroad and improper.

### b. MX's Alleged Specific Deficiencies as to MPI's Responses to MX's Second Set of RFAs

MX also raises a variety of alleged issues with MPI's specific responses to MX's RFAs. The RFAs that MX has separately identified as deficient suffer from the same fundamental issues discussed above, and therefore MX's arguments as to those RFAs fail.

- **RFAs 47, 49, 55, 57 use vague and overbroad terms "Industry" Goods/Services and "Similar to Meta Goods and Services."** MX chose to introduce ambiguity in the term "Industry goods and services" by attempting to expand the definition of "Industry" to cover goods it previously conceded were outside the scope. Section 1.B, *supra*. Additionally, while MX has attempted to redefine (and expand) "Meta Goods and Services," that definition is overbroad, and the additional phrase "used in connection with goods and services similar to Meta Goods and Services" introduces further ambiguity. These ambiguities make it impossible for MPI to meaningfully and accurately respond, as required by Federal Rule of Civil Procedure 36.

- **RFAs 58 to 65 inquire about MPI's awareness and use of the "Meta" Mark in Commerce by using vague, ambiguous, and overbroad terms like "aware of" and "you."** As discussed above, MX's definition of "you" is not limited to MPI but includes a broad and indeterminate

September 25, 2025

Page 31

group of individuals or entities, making the Requests unreasonably expansive and not susceptible to a clear response. Indeed, responding to a single one of these RFAs as defined by MX would require MPI to broadly poll all of its current and former employees, officers, consultants, shareholders, and many more entities and persons.

- **RFA 67 asks about the phonetic identity of "meta" marks.** MPI admitted that "the word 'meta' which is a component of Plaintiff's design mark that is the subject of U.S. Trademark Registration Nos. 5,194,332 and 6,055,841, can be pronounced the same as the word 'meta' in [Defendant's] Meta Mark." Since MPI directly addressed the substance of the Request as written, no further response is warranted or required.

- **RFA 68 asks about a design evocative of "M" and followed by "Meta."** MPI properly objected to these Requests' use of the terms "design" and "evocative" as vague and ambiguous. This Request calls for a subjective assessment rather than a straightforward admission or denial, which is not the proper form of an RFA.

- **RFAs 74-77 ask about MPI's advertising and or/marketing goods and services that "utilize" or are "utilizing" AR/VR/XR/MR.** The terms "utilizing AR/VR/XR/MR" and "advertising and marketing goods and services" are undefined, vague, and overbroad—so much so that similar terms used in MX's RFPs and deposition Topics are the subject of disputes pending before the Court. *Supra* Section I.A.2. MPI cannot be compelled to speculate as to the meaning or scope of these terms at issue.

- **RFAs 78-86 ask about "Immersive Events and Experiences."** MX's definition of "Immersive Events and Experiences"—"consumer-facing events and experiences that utilize augmented reality, virtual reality, extended reality, mixed reality, and other similar immersive and experiential technologies"—is overbroad, vague, and not limited to relevant events or experiences. *See* MetaX's Second Set of RFAs. The additional terms "hosted, organized, and put on" are likewise ambiguous and overbroad, further compounding the lack of clarity. *Id.* These defects render the Requests improper and impossible for MPI to answer accurately based upon a reasonable search.

- **RFAs 93-98 ask about MPI's targeting of "Industry" goods and/or services offered to others.** For the reasons explained above, *supra* Section I.A.2, MPI properly objected to the terms "Industry goods and services," "goods and services utilizing AR/VR/XR/MR," "offering, selling, providing, or rendering," and "targets" as vague and ambiguous. Moreover, the term "targets" is too subjective to be susceptible to a simple "admit" or "deny" response, as required by Rule 36.

September 25, 2025

Page 32

- **RFAs 99-106 ask about MPI's offering of "Industry" goods and services via various channels.** These Requests rely on vague and overbroad terms such as "Industry goods and services," "advertising and marketing," and "goods and services utilizing AR/VR/XR/MR." Additional terms like "to consumers through social media/websites/mobile applications/online stores/in person" are also ambiguous. The meaning of these terms is unclear, making the Requests improper and not susceptible to a clear response.

- **RFAs 107-114 seek information about Instagram/Facebook Blue goods and services utilizing AR/VR/XR/MR.** These Requests use the phrase "utilize AR/VR/XR/MR," which is vague, overbroad, and the subject of ongoing disputes, i.e., in connection with the parties dispute regarding the definition of Industry, rendering the Requests improper for the same and similar reasons.

- **RFAs 115-119 ask about "Subscription Services" and "Industry Creators/Influencers."** MPI's objections to "subscription services," "verification services," and "Industry creators and Industry influencers" are well-founded. These terms are undefined, overbroad, and subjective, making the Requests vague and not reasonably answerable.

- **RFAs 123-126 seek information about assertions of conceptual strength in cease-and-desist letters and USPTO filings.** MX's Requests seek information about statements made by MPI regarding the META mark in connection with any of MPI's goods and services, rather than being limited to assertions made in the U.S. in connection with agreed-upon "Industry" goods and services, which are the only goods and services relevant to the issues in this litigation.

- **RFAs 127-128 ask about MPI's acquisition of "Meta" Marks and domain names.** These Requests are vague, overbroad, and irrelevant, as they concern whether third parties whose META-formative marks and domains were acquired by MPI were informed of MPI's affiliation. This information has no bearing on the claims or defenses in this case, nor is it limited to the relevant goods and services at issue. *Supra* I.B.2.

Respectfully submitted,

September 25, 2025

Page 33

**PRYOR CASHMAN LLP**                    **KIRKLAND & ELLIS LLP**


By:/s/ *Dyan Finguerra-DuCharme*          By:  */s/ Allison W. Buchner*
Dyan Finguerra-DuCharme                     Allison W. Buchner

September 25, 2025

Page 34

## CERTIFICATE OF SERVICE

Pursuant to Standing Order M10-168, I hereby certify that on September 25, 2025, I caused a true and correct copy of the sealed materials related to the foregoing filing and the corresponding papers and exhibits thereto, to be served via electronic mail on all counsel of record.


Respectfully submitted,


**KIRKLAND & ELLIS LLP**

*By /s/ Allison W. Buchner*

Allison W. Buchner